DECISION
The defendant Edwin B. Edwards is charged with the crime of domestic murder in the first degree of his former fiancee, Jeanne Robinson. The State has recommended a sentence of life in prison without parole. The defendant does not dispute that on September 18, 1999, following the wedding of her daughter, he strangled Jeanne Robinson, beat her multiple times with a flashlight and ran her over with his car. He instead asserts a defense of diminished capacity based on an alleged overdose of klonopin, an anti-anxiety medication, and argues that his klonopin intoxication, combined with his underlying generalized anxiety disorder, created in him a state of behavioral disinhibition that prevented him from premeditating and forming a specific intent to kill. He contends that, at most, he should be convicted of the lesser offense of manslaughter.
The defendant waived his right to a trial by jury. This decision follows the nonjury trial of this matter.
 PROCEDURAL HISTORY
On December 13, 1999, a Grand Jury of the State of Rhode Island charged that on a day or dates between September 18, 1999 and September 19, 1999 in Cranston, Rhode Island, the defendant, Edwin B. Edwards, did murder Jeanne Robinson in violation of R.I. Gen. Laws 11-23-1, 12-29-2 and12-29-5. The charge is one of domestic first degree murder, based on the relationship of the defendant and the victim. On January 7, 2000, the State filed with the Court a written recommendation that the defendant be sentenced to a term of life in prison without the possibility of parole for the crime of first degree murder committed in a manner involving torture or aggravated battery to the victim, pursuant to R.I. Gen. Laws11-23-2(4).
On January 8, 2001, when the Court reached the case for trial, the defendant submitted in open court a waiver of the right to trial by jury signed both by the defendant and his attorney. The Court confirmed the defendant's signature and the fact that the defendant waived his right to a jury trial knowingly, intelligently and voluntarily. The defendant thereafter was tried before the Court without a jury.
Prior to trial and with the consent of both parties, the Court took a view of the top of the Newport Bridge, inclusive of the alleged locations where the defendant and the defendant's car were observed in the early morning hours of September 19, 1999, shortly after the killing of Jeanne Robinson. During pre-trial hearings, the defendant moved in limine, pursuant to Rule 404(b), to bar the State from introducing in its rebuttal case the testimony of Susanne Murray, the defendant's first wife, as to his alleged abuse of her during their marriage. The Court deferred ruling on that motion, pending presentation of evidence in the prosecution's case-in-chief and the defendant's case. The defendant also filed a pre-trial motion to suppress evidence of his statements to the police on the bridge and later at the police station. Counsel agreed that rather than holding a pre-trial suppression hearing, the Court could hear the defendant's statements and the testimony of Detective Rosa, Trooper Liu and Detective Falcone surrounding them, along with the other testimony and evidence introduced at trial, and reserve decision as to the motion to suppress until after the close of the evidence. The Court granted the defendant's pre-trial motion under Rule 23(c) by which he asked the Court to state separately its findings of fact and conclusions of law in support of its decision.
The case proceeded to trial on January 8, 2001 and concluded on January 23, 2001. The State first presented its case-in-chief. When the State rested its case, the defendant moved to dismiss the charge of first degree murder on the grounds that the State could not prove malice aforethought beyond a reasonable doubt. With the consent of counsel, the Court reserved decision on this motion to dismiss until after the close of all of the evidence. The defense then proceeded to present evidence in support of its case. The defendant testified and presented expert testimony in support of his defense of diminished capacity. After the defense rested its case, the State presented expert and lay testimony in its rebuttal case. As the defense presented evidence of the defendant's problems with his first wife in support of his defense and as the Court deemed such evidence as probative as to the issue of intent and capacity, valid impeachment evidence with respect to the in-court testimony of the defendant and his experts and not unduly prejudicial in this bench trial, it allowed the State to present the testimony of Susanne Murray in its rebuttal case. That evidence was limited to the defendant's alleged abusive acts toward her when drinking and not drinking.
At the close of all of the evidence, the defendant made no motion to dismiss, as he had at the close of the evidence offered by the State in its case-in-chief. This Court reserved decision as to the defendant's guilt with respect to the charge of first degree murder and the lesser included offenses of second degree murder and manslaughter by reason of diminished capacity. This written decision sets forth the Court's findings of fact and conclusions of law, inclusive of its rulings on both the defendant's motion to suppress and the defendant's motion to dismiss on which it reserved decision at the time of trial.
 FACTUAL BACKGROUND THE PROSECUTION'S CASE-IN-CHIEF
The defendant Edwin B. Robinson (also known as "Brad" or "Bran") and the victim Jeanne Robinson had a turbulent three year relationship, fraught with conflict, before he finally killed her on September 18, 1999. Brad had a difficult time controlling his temper which would lead to frequent arguments and occasional violence in Jeanne's home. He was stressed by her children and her ex-husband's family, by being alone without her, by sharing her with others and by their conflicts in general. She tried to get him help. The fatal intersection of their lives occurred late at night, after the wedding of Jeanne's only daughter, Jendra Robinson Jarnigan. It was one of the happiest days of Jeanne's life and, correspondingly, a day that made Brad feel intensely anxious, angry, jealous and insignificant. After he took her home from the wedding, she ended their relationship and threw her engagement ring at him. He secured the ring and then broke into her bedroom, where he strangled her. He followed her downstairs and then beat her over the head multiple times with a flashlight. Once outside, she called, as best she could, for help. He silenced her and ran her over with his car. He was subsequently talked off of the Newport Bridge after threatening to commit suicide.
 The Early Years
The couple met in August 1996 at Rhodes-on-the-Pawtuxet and began a substantive dating relationship. They were both in their late 40's. She had been married once before, to Wayne Robinson, and had two adult children from that marriage. She maintained a close relationship with her family. Brad had been married twice before, first to Susanne Murray and then to Cynthia Edwards, but had no children. Jeanne worked as a charge nurse and Brad worked as a truck salesman for Colony Ford. Jeanne lived in her home located at 167 Fiat Avenue in Cranston, Rhode Island. Brad maintained a nearby apartment in Cranston where he lived by himself when he was not co-habitating with Jeanne at her house.
On Saturday night, March 8, 1997, Jeanne and Brad experienced a particularly volatile time in their relationship. After an argument, Brad came to Jeanne's house and broke into it through the locked breezeway door leading to the kitchen. Jeanne was home at the time, although it is unclear whether Brad knew that fact. She was so afraid that he would return. She called Josee that night to tell her how scared she was about that prospect. She assured Josee that she would call her father, Albert J. Girard, Sr. When she talked to Josee the next day, she said that her father had stayed with her. Mr. Girard testified that he recalled the incident and fixing the door and that he had advised Jeanne not to see Brad again.
Following this incident, Brad wrote Jeanne two letters of apology. In his first letter, postmarked March 11, 1997, he apologized for what he had said to her and blamed it on being drunk and out of his mind. He apologized for what he had put her through over the preceding couple of weeks and his failing to trust her. He offered to pay for the damage to her home. He said he wanted to get his clothes back. He said he did not know if she would ever speak to him again but that it was real nice knowing her. He said she was so good to him.
In his second letter of apology, postmarked March 14, 1997, he said he was so sorry for what he did to her. He said he knew she left Jack for hollering and fighting and then he turned around and did basically the same thing, probably worse. He told her he would always love her and wished that things could have been different. He enclosed a $100 check to pay for the damage to the house. He thanked Jeanne for putting his clothes out in the hallway. He said he got a message from Dianne that they were out there but that he had not gotten around to picking them up yet. He wrote "You don't have to be afraid of me because I never would lay a hand on you." He told her that he guessed the worst came out in him when he drank. He said he did not mean the things on her answering machine. He acknowledged that Jeanne had told Dianne to tell him that it was over between them and that she did not want to see him again, but he said that he still would like to talk to her. He pleaded with her to call and thanked her for all the good times.
Brad and Jeanne apparently did get back together at some point in time. By late 1998, Jeanne and Brad were engaged to be married. He gave her an expensive diamond ring. They had no plans to get married and did not want to set a date until after the wedding of Jeanne's daughter, Jendra Robinson, on September 18, 1999.
 The Weeks Before the Wedding
The relationship between Jeanne and Brad almost ended a month or so prior to the wedding. Jeanne discovered for the first time that Brad had been married twice before. Up until that time, she had not known of his first wife. She felt deceived by Brad and told him that she did not want to see him anymore. Brad did not take that news well. He left repeated messages about wanting to get his things from her house. His reaction made Jeanne fear for her life. Jeanne called her sister, Patricia McGowan, and tearfully told her that she was afraid to go to bed that night. In speaking to her sister, Jeanne made reference to the prior incident in March 1997 of Brad breaking into her house. Jeanne ominously warned her sister: "Patty, if anything happens to me, Brad did it." Patty advised Jeanne to call the police or seek a restraining order, but Jeanne elected to do neither of those things. She suggested that Jeanne leave and let Brad get his things. Jeanne was afraid to do anything, including leaving home. Later, Jeanne advised Patty that she had talked to Brad and that he had agreed to get help for himself.
Brad, meanwhile, had contacted Jeanne's father to enlist his help in getting Jeanne back. Brad explained to Mr. Girard that he had not told Jeanne about his first marriage because he loved Jeanne and was afraid that she would think he was a loser. Brad said he was afraid now that he would not get invited to the wedding of Jeanne's daughter. Mr. Girard counseled Jeanne to give Brad a chance and invite him to the wedding.
The prospect of the wedding, however, continued to be problematic for Brad. He was very distressed that he would have to be in the company of Jeanne's ex-husband, Wayne Robinson, and his family. Brad was jealous of the close relationship Jeanne still maintained with them. Brad's distress prompted him to tell Jeanne's daughter, Jendra, that he would not attend the wedding if he had to be photographed with Wayne Robinson. Later, Brad sent Jendra a letter to apologize for taking such an immature stance and reassuring her that he loved her and her mother. He told her that he was not always the easiest person to show his emotion and that a lot of times he seemed hard and cold. He assured her that he did not mean to be that way.
 The Wedding Day (September 18, 1999) The Hours Before the Wedding
It was September 18, 1999 — the wedding day of Jendra Robinson, Jeanne Robinson's only daughter, and Alec Jarnigan. On that day, Jeanne and Brad were emotionally at polar extremes. Jeanne was an excited mother of the bride, exhilarated by the prospect that her daughter, Jendra, with whom she was so close, would be marrying. In this proud moment, Jeanne would be surrounded by so many close family members and friends. It promised to be one of the happiest days of Jeanne's life.
Brad, on the other hand, did not want to go to the wedding. He did not want to meet the family of Jeanne's ex-husband, Wayne Robinson. He did not feel a part of Jeanne's family. He knew he would be with Jeanne but alone. He resented her joy.
In the early afternoon of the wedding day, the bride and bridesmaids gathered at Jeanne's house to get ready for the wedding. They all were happy and excited as they dressed and took photographs. For the most part, Brad stayed out of the way and was gone from the house or not observed by those present for periods of time during the day before the wedding.
When Brad was around, however, there was tension between he and Jeanne. At one point, they got into an argument over Jeanne's medication which Jeanne's niece, Kelly Anderson, witnessed. Jeanne had experienced a recent kidney problem that required her to take medication. Brad was insistent that she take this medication on the day of the wedding. Jeanne resisted because she wanted to enjoy the day. Brad angrily responded "if I have to take my medication, so do you. If you don't take your medication, I won't go to the wedding." He then stormed out of the house, later calling Jeanne twice in quick succession to try to smooth things over and ensure her that he would go to the wedding.
While Brad was gone, Jeanne kept seeking reassurance from Kelly that her hair looked fine for the wedding. Jeanne was concerned about how she looked because earlier in the day, Brad had told her that he did not like her hair. It was important to Jeanne that she look beautiful for her daughter's special day. Jeanne told Kelly that Brad had really done a number on her self-esteem.
Jeanne's good friend, Josee Davis, also arrived while Brad was gone. Jeanne had invited Josee over to share in the pre-wedding festivities. Josee and Jeanne had met years before when they worked together and they generally went out together every other weekend. They saw each other less frequently after Jeanne and Brad got engaged. They had become closer after Josee confided in Jeanne about her own abusive relationship. Jeanne had told Josee that she was concerned about Brad's anger problem and the fact that he wasn't crazy about her children. She confided in Josee about an incident where Brad had broken down her door. Josee's understanding was that Jeanne and Brad had broken up in the weeks prior to the wedding and that Jeanne had helped Brad meet a doctor to assist with anger control. Josee thought they were back together as of the time of the wedding because Jeanne had her engagement ring on. Josee was concerned that Brad might be abusing Jeanne, but Jeanne denied that Brad had ever hit her. On the day of the wedding, Jeanne had invited Josee to leave her car at Jeanne's house and ride to the wedding with she and Brad because Josee did not drive on freeways.
Brad later returned to the house, dressed in his tuxedo. He carried beer and ice into the backyard and began setting up for a party that Jeanne was to host at her house after the wedding. Josee Davis spent some time in the backyard with him. Brad and Josee each had one beer. Josee told Brad that she thought he had given up drinking. He assured her that he had given up drinking, but that beer does not count. He told her that only the hard stuff counts. After touring the backyard with Brad for 15-20 minutes, Josee came back inside to have something to eat and watch the picture taking. Brad remained outside for awhile and did not participate in any of that activity. He showed no visible signs of intoxication.
Finally, it was time to go to the wedding. As the bride and her bridesmaids were getting into the limousine, the granddaughter of Jeanne's neighbor, Alma Miller, came over to see them. Alma Miller watched from across the street and saw Jeanne, Brad, Jendra and her bridesmaids getting ready to go to the wedding. Brad took photographs of the little girl with Jendra and Jeanne.
Brad then drove Jeanne and Josee to the wedding in his car. En route, Brad and Jeanne had another argument about medication. Brad reached into the console, took out a pill vial, read the label and put it back. He then picked up a second vial and ingested a pill from it. Jeanne said "What are you doing?! You just took one an hour or an hour and a half ago. You're gonna be flat on your face." Brad assured her that he could handle it. At no time during the drive or at any time earlier in the day did Brad show any apparent difficulty in saying or doing anything nor did he exhibit any outward signs of intoxication.
 The Wedding
A videotape of the wedding ceremony that was introduced as evidence at trial showed Brad appropriately walking Jeanne down the aisle to her seat. It also showed Brad standing in the receiving line with her. In that line, Jeanne took an active role in greeting guests. Brad appeared as if he did not want to be there. After the receiving line, the testimony at trial showed that the families assembled for photographs. Brad remained detached. He did not want to be photographed with Wayne Robinson, Jeanne's exhusband and father of the bride. He had to be coaxed repeatedly by others to participate in the picture-taking. The videotape of the reception showed a time, during the cocktail hour, when Jeanne appeared in Brad's company. They are not looking at one another and there is no interaction between the two of them.
At trial, Jeanne's sister, Patricia McGowan, testified to an incident between Jeanne and Brad that happened during the reception. Patricia and her sister Geraldine and others were standing with Jeanne and laughing and talking. Brad was standing with them. At one point, someone spilled a drink that Brad was holding on Jeanne's dress. The mood suddenly changed. Brad got a mean upset look on his face. Jeanne tried to joke that Brad had bought the dress so it didn't matter if he spilled the drink, but Brad didn't think that was funny. He walked away, leaving Jeanne awkwardly standing there without him.
This incident prompted Jeanne to walk outside for a private moment with her sister Patricia. Jeanne said "I've finally had it. You don't understand. You just don't know what is happening to me. And now Brad has left me and I am here by myself at the wedding." A few minutes later, Brad returned. Jeanne tried to console him about the drink spilling incident, saying it was just a joke. Brad was still upset and maintained that it was not a joke.
At dinner, Brad and Jeanne sat at a table with her parents and two of her sisters and their husbands. Jeanne spent most of the evening mingling with friends and family. Brad sulked and remained detached. He was not observed eating or drinking while he was at the table. He was not an integral part of the evening festivities. Indeed, there were times during the reception that no one saw him at all. At one point at the table, he and Jeanne got into an argument because she wanted him to meet her ex-husband's brother, who was in the car business, and explore doing business with him. Brad was adamant that he did not want to meet Wayne's brother. Jeanne's father finally advised her to drop the subject, suggesting that Brad was a successful businessman in his own right.
The videotape of the wedding introduced into evidence at trial also showed Jeanne dancing with her daughter, Jendra. They both looked radiant and intensely happy and cried tears of joy as they held each other closely. They were basking in the wonder of a very special day. Jeanne looked so proud of Jendra. Brad stood at a distance, watching them and photographing them. Jeanne later sat on his lap, as shown on the videotape, and they both posed for a picture. Brad grinned and waved for the camera.
Later in the evening, shortly after 9:00 p.m., Brad danced with Jeanne. Their slow dance, as shown on the videotape, stood in marked contrast to Jeanne's dance with Jendra. Jeanne appeared serious and tense as she initiated a brief discussion. Brad responded with few words and showed little emotion or expression. Toward the end of the dance, he kissed her firmly. He had no trouble dancing.
In the last segment of the videotape, Brad is shown crossing the floor of the reception hall at the end of the reception. He walked normally and with purpose. At no time during the wedding and reception did he have any apparent difficulty in his speech or gait nor did he evidence any other outward signs of intoxication.
Brad and Jeanne were among the last of the guests to leave the wedding reception. Both Kelly Anderson, Jeanne's niece, and Albert Girard, Sr., Jeanne's father, testified that they saw nothing untoward in Brad's behavior when they said their good-byes and left the reception. Jeanne's ex-husband, Wayne, helped take down the white twinkle lights that had been used as decorations so they could be loaded into Brad's car and taken back to Jeanne's house. Brad was helping to pack centerpieces and other items in the back of his car.
Albert J. Girard, Jr., Jeanne's younger brother, waited around after the reception to talk to his sister. He had been out of state for a few years and wanted to become closer to her. Jeanne, who was like a mother to him because of their age difference, assured him that he had always been her first son.
As he was walking out, Albert then ran into Jeanne's ex-husband, Wayne, with whom he had been very close growing up. They had not seen each other in a long time and talked about making plans to go fishing together.
Finally, as Albert headed to his car, he ran into Brad at the back of the building where Brad was loading his trunk. No one else was around. Albert said he was just moving back to Rhode Island and suggested that maybe he and Brad could go fishing together. Brad indicated that he and Jeanne would really enjoy that. Albert talked to Brad about how Brad felt with Wayne around and how things were going with Brad and Jeanne. Brad said he didn't have a problem with Wayne but he didn't want to hang out with him and he didn't want to meet Wayne's family. Brad was flustered, upset and bent out of shape about the prospect of meeting Wayne's family. He was adamant that he did not want to meet them. Albert formed these impressions based on the tone in Brad's voice and the look in his eyes. He had never seen Brad upset like that before. In the course of their conversation, Brad somehow mentioned to Albert that he had been taking tranquilizers. After hearing that, Albert was concerned that Brad not be mixing tranquilizers and alcohol, especially if he were about to drive. He told Brad that he hoped Brad had not been drinking. Brad responded that he had not been drinking but that he might be looped out on Sprite. Nothing about Brad's speech, gait or balance led Albert to think that Brad was under the influence of drugs or alcohol. During this conversation, Brad also assured Albert that he loved Jeanne a lot.
 The Mother of the Bride Goes Home
Brad left the wedding reception with Jeanne and Josee Davis around 10:30 p.m. that night. There was no plan for guests to return to Jeanne's house for more celebration. Brad drove, Jeanne sat in the passenger seat and Josee sat in the back seat. The drive from the reception in Bristol to Jeanne's house in Cranston took about thirty minutes. Brad had no difficulty driving home. He did not drive erratically, he never hit anything and at no time did Jeanne have to tell him to pull back into his lane. His speech was fine. Brad did not open the console, take out any pills or have any conversation about medication on the way home.
On the ride home, the three occupants of the car talked about the wedding. At one point, Brad said that he did not want anything to do with Jeanne's ex-husband's family. Josee said he made it very "cut and dried." Jeanne said nothing in response, although Josee got the impression that they had talked about the subject before they got in the car. Josee and Jeanne talked at length about how great the wedding had been and how everything had gone so well. As they neared Jeanne's house, Jeanne told Brad that she would like to go to bed and that she would like him to leave. She told Brad that when Josee left, he should leave, too. Jeanne said that she wasn't feeling well. Brad did not argue or say anything in response.
When they arrived at Jeanne's house, Brad drove into the driveway and pulled the car up near the garage. They all got out and Brad stood in front of the car, to the left, between the car and the garage. Jeanne opened the door to the house, and Josee went into the house for a few minutes to get her cars keys so she could drive home. Jeanne stood in the doorway talking to Josee as Josee transferred her flowers from Brad's car to her car on the street. They conversed for about five minutes. Jeanne asked Josee if she was okay to drive, and Josee assured her that she was fine. They had an agreement to always be honest with each other about such matters. Josee asked Jeanne if she was okay because Jeanne had said that she wasn't feeling well. Jeanne thanked Josee for being part of one of the happiest days of her life. Josee said goodnight to Jeanne and Brad and they said goodbye to her. Josee had no trouble understanding Brad.
During this whole time period, Brad never moved from his spot in the driveway. He had no observable trouble standing or with his balance. Josee assumed that he was waiting for her to leave so he could say goodnight to Jeanne and let her go to sleep. Josee drove on the back roads from Jeanne's home in Cranston to her home in Warwick, estimating that she arrived home between 11:30 p.m. and 11:40 p.m. after a drive of 20-25 minutes. By her calculations, she left Jeanne's house sometime after 11:00 p.m. and perhaps as late as 11:20 p.m. on September 18, 1999. Josee said she never would have left Jeanne with Brad if she thought Jeanne was unsafe.
 Trauma in the Neighborhood
Just before midnight on September 18, 1999, Alma Miller, who had been a neighbor and friend of Jeanne for over twenty years, was sitting at her kitchen table clipping coupons from an early edition of the Sunday paper, as was her usual weekend custom. She heard a voice from outside saying "Help me. Help me." She thought it was Jeanne. The person was not screaming but saying the words in a quieter voice but loud enough so they could be heard by Alma Miller inside her home across the street with the doors and windows closed. Alma Miller paused for a few moments, thinking it was odd. She then got up from the table, unlocked and opened the door, flipped on the lights and stood looking out of the screen door and across the street to Jeanne's house. She estimated that no more than a minute passed from the time that she heard the voice until she flipped on the lights and that it took her about 20 seconds to open the door and put on the lights.
Alma Miller looked across the street toward Jeanne's house. The photograph received in evidence as State's Exhibit 2 shows the view that Alma Miller had that night. A light on the front of Jeanne's house, located between the garage and the breezeway and right above the driver's side of Brad's car, illuminated mainly the front of his car and the driver's side door; the rest of the driveway was more in shadow. The car itself was pulled up close to the garage door. Alma Miller does not believe that the floodlight, on the opposite corner of the garage, was on. She said she could not see in back of Brad's car very well nor could she see to the right of his car along the hedges. Had a person been lying on the ground behind the car, she says she would not have been able to see that person. Had a person been lying on the driver's side of the car or walked or run behind the car, however, she says she would have been able to see that person.
Moreover, as Alma Miller looked out her door, her attention was drawn not to the driveway itself or to the roadway but to Brad as he stood next to the driver's side door of his car. She testified credibly at trial that he appeared hesitant, that he stood next to the car door for 5-10 seconds before he got in and that all of his attention did not appear to be focused on getting into the car. Although she had told the police, immediately after the incident, that she saw the defendant "attempting" to get into his car and that he appeared to be having "difficulty," she put those earlier statements in context at trial. She explained that her earlier statements were based on her assumption that he might have been drinking, as she knew that he had been to a wedding. The only "difficulty" that she actually observed Brad experiencing when he stood outside his car, however, was hesitancy and lack of full attention to getting into the car.
When Brad finally got into the car, he did not have any trouble doing so. He started up the car and backed down the driveway immediately in one fluid motion. As he backed the car down the driveway at a fast pace, it bounced and bucked, like an inexperienced driver trying to use a clutch. When the car got to the end of the driveway, it cut to the right, with the passenger side tires cutting across the grass a little bit. The car backed up and went forward again in one motion with the car still bouncing. Alma Miller observed no brake lights and does not recall seeing any back-up lights. She said that Brad never stopped the car or got out of it after he left Jeanne's house and made his way down the street in the direction of Bain Junior High School.
Once Brad's car was gone, Alma Miller noticed something in the street, to the left of Jeanne's driveway. She knew it was a body. She grabbed her cellphone and a flashlight and ran out to the street so no one would run over the body. Jeanne was lying in the roadway with injuries so severe that she was not recognizable to Alma Miller. In the words of Alma Miller, she looked like a "rag doll."
Alma Miller immediately called 911 from the street. On the audiotape of the 911 call, she can be heard hysterically trying to get help. She said that there is a person lying in the middle of the street and that someone ran them over. When the police asked her if a car hit the person, Alma Miller said that she couldn't explain, that someone was backing out of their driveway and that someone was lying in the street, run over by the car. She said the car that hit them is gone. She also told the police that she witnessed the accident. When the officer asked her if a car just came flying down the Street and hit someone and took off, she responded "No. No. No. No. The guy was backing out of his driveway and I don't know. I heard someone yell help. There was a wedding. I don't know if the guy was drunk or what." She said the guy dragged them down the street. She was positive that it was Brad's car, describing a black car driven by the guy who lives there.
At trial, Alma Miller testified credibly that her statement in the 911 call about Brad possibly being drunk again was based on her assumption that he had been to the wedding and might have been drinking. She clearly was trying to make sense out of her observations at the time (and perhaps not rush to judgment as to Brad) before she had many facts. She was quite clear that her assumptions drove her statements and not any direct observations as to Brad's actions or inaction consistent with intoxication.
When Sergeant Henry of the Cranston Police Department arrived, immediately after the initial officers and rescue had arrived, he noted that the victim was covered with "road rash," a combination of dirt and lacerations from her body hitting the cement. Her nightgown was rolled up around her neck and chest. She was lifeless. Alma Miller could not confirm her identity. In an effort to identify the victim, he went to Jeanne Robinson's house, got no response and found that the door leading from the kitchen to the breezeway was open. He found pictures that looked like the victim, although he still was not positive it was Jeanne Robinson. He also noticed blood on the street and the driveway. Inside the house, he noted large puddles of blood in the kitchen, blood smears on the kitchen floor and a large black flashlight covered with blood on the kitchen floor. He secured the scene anwent to notify Jeanne Robinson's family. He found Wayne Robinson and drove him to Rhode Island Hospital. Sergeant Henry returned to the scene later to secure the defendant's bloodied tuxedo shirt that had been found by a pedestrian near Bain Junior High School.
 The Road to the Bridge
Just after midnight, at 12:04 a.m. on September 19, 1999, while the police and rescue were en route to Fiat Avenue, the defendant used his cellphone to call his sister Debbi Pappas who was the Chief Secretary and Records Clerk for the Portsmouth Police Department. His cellphone records indicate that the call lasted for 8 minutes. He said "I think I'm in trouble. I've killed Jeanne." Debbi responded by saying "No, you didn't. Are you sure?" Later Brad said "Maybe she's all right. Here's her telephone number: 529-1122. Call her up." Brad said "I'm driving to the bridge to jump because I don't want to go to the ACI." Debbi said "Stop. Don't go any further. Call the police or go home and call the police." At one point Brad said "I'm wearing a tux and it's covered in blood." He said "I hit her with a flashlight and ran her head over twice." He said he had life insurance policies at work and that either Debbi or his sister Cindy was the beneficiary and that he wanted them to know that. He said the ring he gave Jeanne was in the glove box. He said he was driving like a maniac and had done some minor damage to his car during the drive from Cranston to Newport. Brad volunteered that he was sober. Debbi testified that Brad's voice was quiet and rambling, like someone who had been drinking a lot. She had no difficulty understanding him nor did she note any slurred speech. She conceded on cross-examination that the real reason she thought he sounded intoxicated was that she knew something was wrong with him. She candidly admitted, however, that she had never dealt with someone who had just killed someone before. She implied that Brad's just having killed someone clearly could have explained his rambling speech. Their call ended at about 12:12 a.m. on September 19, 1999.
A couple of minutes after Brad called Debbi, he called the operator. A minute after that, he called Jeanne's house. That call lasted for less than a minute. At 12:17 a.m., he called his sister Cindy. About that time, Debbi was talking to Cindy about the call she had just gotten from Brad and Brad either beeped in or got through to Cindy. Cindy hung up from talking to Debbi and took Brad's call. Cindy and Brad talked for 18 minutes (from 12:17 a.m. until 12:35 a.m.). After he hung up, she called him right back and they talked for another 5 minutes (from 12:36 a.m. until 12:41 a.m.). After that, he hung up again and she called him back three times in rapid succession, at 12:41 a.m., 12:42 a.m. and 12:43 a.m. Each of those times, the phone kept cutting out.
In his first telephone conversation with Cindy, Brad said he had killed Jeanne and he was on the way to the bridge to jump. He later said he was on the bridge. She spoke to him while he was out of his car on the bridge. He said he was going to jump. He then said "Oh, Frankie Rosa's here. There's Frankie Rosa." He was referring to Officer Frank Rosa of the Newport Police Department (and formerly of the Portsmouth Police Department) who was a long-time friend of the family. Cindy testified, and told the police after the incident, that Brad had just swallowed a bottle of pills and that she heard him swallowing. She surmised that he must have told her that although she said she could not recall. There was clearly more to their lengthy conversation that what she related at trial. She also testified that the defendant sounded out of it and that he sounded drunk, although she did not put that in her police statement and her impression was based only on his rambling conversation and not any slurring or other difficulties in his speech.
At some point after midnight on September 19, 1999, Stephen Clarke, the supervisor working at the entrance to the Newport Bridge in Jamestown that night, received a report of a man stopped on the center span of the bridge. He notified the State Police and the Newport Police and then drove up to the top of the bridge in his own emergency vehicle. Prior to that time, neither Stephen Clarke nor James Romano, the only toll collector working the inbound lane to Newport that night, noticed anyone trying to run the lane without paying or otherwise exhibiting any erratic driving.
 Atop the Newport Bridge
At the top of the bridge, two Newport patrol cars arrived just after Stephen Clarke got up there and a Jamestown patrol car just happened to be on the bridge as well. A black car with the license plate BE-27, which later was identified as the defendant's car, was found parked directly against the curb near the top of the bridge with the motor turned off and its flashers on. No one was inside the vehicle. The officers fanned out in different directions, trying to find the defendant.
Detective Frank Rosa checked the defendant's car and found no note and a pill bottle with "Edwards" written on it. Officer Sylvia of the Newport police then yelled "I've found him!" The defendant had crawled over the side of the bridge, onto a platform and then across and onto an I-beam situated 6-8 feet out from and parallel to the side of the bridge. This I-beam is used by persons repairing the bridge. The defendant sat straddling the I-beam, facing Newport, with one leg on one side of the beam and the other leg on the other side. There was water hundreds of feet below him on either side.
As Detective Rosa approached the defendant, the defendant recognized Rosa and said he was glad to see him. Rosa was an old family friend who knew the defendant from attending the wedding of Brad's second wife. Rosa asked him what he was doing out there. At the time, Rosa had not spoken to the Cranston police about anything in Cranston. As Rosa got within 20 feet of Brad, however, Brad got anxious, started moving around a lot and threatened to jump if anyone came any closer. Detective Rosa decided that because he knew the defendant, he should be the one to talk to him to try to gain his confidence and get him onto a safe part of the bridge. Rosa kept eye-to-eye contact with the defendant and kept up a continuous conversation with him. Rosa let him take the conversation anywhere that he wanted it to go. Detective Rosa knew that if he stopped talking or said the wrong thing, the defendant might jump.
Just as Detective Rosa began to establish some sort of rapport with the defendant, Brad's cellphone rang. He had no problem answering it. He said "I can't speak right now. I'm busy. I can't talk. I'm busy." He then angrily threw the phone into the water.
The defendant told Rosa that he had done something that he couldn't deal with. Brad held up his bloody hands and said "I killed her. I killed her." Rosa tried to calm Brad down, encouraging him to come over the railing so they could talk and work everything out. Brad kept saying that he did something wrong and that Rosa didn't understand. He asked Rosa to get the Cranston Police to 167 Fiat Road. Rosa asked him who they should be looking for at that address, and Brad said Jeanne Robinson. At the defendant's request, Rosa advised the other officers to call the Cranston Police and check on Jeanne Robinson. At that point, the situation escalated with Brad. He showed Rosa his hands, swung around facing the ocean and emptied his pockets.
Detective Rosa just wanted the defendant to look at him. Brad said "You just don't understand. I can't go to the ACI or the loony house. This is her blood on my hands." Brad kept bringing up Jeanne and the blood. He said "I killed her tonight. I beat her with a flashlight. I ran her over with my car twice." The defendant wanted Rosa to call the hospital and check on her condition. Detective Rosa used that to suggest to Brad that he come over the railing so they could call together.
Detective Rosa got closer to the defendant. By this point, which was about 15-20 minutes after Rosa initially had approached Brad, the defendant's speech began to show the first evidence of slurring. He assured Rosa that he was okay. Brad stated that he had taken 25-30 pills today. Brad commented that he was losing his train of thought. The officers at that point ordered the bridge closed. The defendant said to Detective Rosa, "It all started in the house Frankie. I kicked in her bedroom door, I beat her, I tried to calm her down, I dragged her outside, I slammed her head into the driveway and I ran over her to kill her. You see why I have to end my life."
The defendant said that he was not feeling well and that the pills were beginning to work on him. Detective Rosa told him that he had to get off the beam. Brad's speech became more slurred, but he said "you know I'm okay out here." The defendant moved to the platform. It took about 15-20 minutes to get him there. Once he was on the platform, he came face to face with Rosa and said "I know what's gonna happen. You guys are gonna muckle me. I know I really messed up tonight."
Once he got onto the staging area, between the beam and the side of the bridge, he asked to talk to "the Trooper." He pointed to Trooper Liu of the Rhode Island State Police. As Liu approached, the defendant told him that he respected Liu and his office. He shook Liu's hand. The defendant started a conversation about giving his car to his sister. He talked about the $9000 ring and the cash in the car. The defendant tried to get Liu to go to the car to look for those things. Liu said he would not go look in the car until he knew Brad was safe. Liu asked Brad if he had been drinking, and Brad said that he does not drink. Liu asked about drugs, and Brad said that he took two prescriptions. He said he took none of the first and 3-4 pills of klonopin. Liu tried to talk him over the railing, but he said that he could not go to the ACI. Liu agreed that if Brad came over the railing to talk to him, he would help Brad get his things.
The defendant got suspicious at that point and started to get distraught and weave back and forth. Trooper Liu thought that could have been from drugs. Liu grabbed him and told Brad that he was going to hold him so he would not fall over. Both Liu and Rosa then grabbed Brad and pulled him over the railing. Brad resisted. The other officers rushed the defendant and were able to help muckle him. As is standard practice with suicide suspects taken off the bridge, the officers placed the defendant in handcuffs and took him immediately to the emergency room at Newport Hospital for evaluation. They left the bridge at 1:51 a.m. At Newport Hospital, they explained to the doctor that the defendant had just come off the bridge and that he said that he had taken a large amount of pills for anxiety and depression.
 The Defendant at Newport Hospital
Nurse Catherine Aubin, a nurse who has been employed by Newport Hospital for over 25 years and has been in the emergency room for more than eight years, first received the defendant as a patient in the emergency room at 1:55 a.m. on September 19, 1999. The police brought him into a psychiatric room and told her that he was a suspect in the murder of his girlfriend in Cranston and that they had taken the defendant off the Newport Bridge. Nurse Aubin initially was alone with the defendant in the room. He had dried blood on his hands. He told her that the blood was from his girlfriend and that he had hurt her. He asked if he could wash off his hands, and she told him that he could not wash his hands because the police might need the blood as evidence. She asked the defendant to get undressed. He was wearing a gray sweatshirt and black pants.
The defendant told Nurse Aubin that he had gotten into an argument with Jeanne. He said "he choked her and when she wouldn't shut up, he hit her over the head with a flashlight and when that didn't shut her up, he dragged her outside and ran her over with his car." When he described these acts, he had a monotone voice and no affect, and Nurse Aubin could understand him fully. He told her that he took 20 Buspar. He said he took the pills after he hurt Jeanne because he was scared. Nurse Aubin was very upset by the defendant's story. She had not seen many cases like this one in Newport. She went to report to Dr. Gleason what the defendant had said, and she started crying. Dr. Gleason was concerned about her and asked if she would like to be relieved from the case. She declined and simply took a few moments to compose herself.
The staff moved Brad into an observation room to monitor him for a possible drug overdose. Nurse Aubin found that the defendant had thick speech. From that, she would have expected to smell alcohol on his breath, but there was nothing. He had no trouble understanding him and found him cooperative and not resistant. She never got the sense that he did not understand what was going on. The only question he asked was if the police could call Rhode Island Hospital to check on Jeanne Robinson. He had a flat affect and was very concerned about his car being towed to Newport Hospital. According to Nurse Aubin, he was more concerned about his car than anything.
Shortly after 2:00 a.m., Dr. Gleason, an emergency room physician, saw the defendant. He knew that this patient had told Nurse Aubin that he had ingested 20 tablets of buspar, an anti-depressant medication. The defendant told Dr. Gleason, however, that he had taken his usual amount of buspar today which is two tablets. Dr. Gleason then asked Brad if he had overdosed on any medication. Brad said that "he overdosed or he ingested the entire bottle, the remainder of the bottle of klonopin that he had." He said that he had ingested that bottle on the Newport Bridge. He said he thought there were 35 tablets in the bottle. Nurse Aubin said she was in the room for part of this conversation. She heard the defendant tell Dr. Gleason that he had taken only his prescribed dose of buspar today, one in the morning and one in the evening, and 3 klonopin. He denied drinking any alcohol. She did not hear their conversation about the ingestion of klonopin on the bridge, nor did the defendant mention klonopin to her at any time, including when she asked him what medications he took currently.
The defendant also told Doctor Gleason that he had gotten into an argument with his fiancee, she had thrown a ring away, he had tried to get into the house or apartment, he had knocked down the door and then he had strangled her. During this conversation, Dr. Gleason had no difficulty understanding Brad and did not find his voice to be slurred. He next examined Brad and noted that Brad had scratch marks on his chest and that his right hand was hurting. On his initial assessment of Brad, he did not believe that he was suffering from a klonopin overdose (which the doctor had seen many times) because he was not sedated, sleepy, slurring his speech or difficult to arouse. Dr. Gleason did not find his speech to be thick. He displayed no signs that he was suffering from a drug overdose or that he was highly intoxicated. Dr. Gleason suspected that he may have overdosed on some medication, most likely klonopin, but possibly buspar because his story was difficult to assess at that time. He treated him as he would someone who had possibly overdosed. He ordered that the defendant be given a charcoal drink to absorb any toxins in his stomach and be observed for four hours to determine if there were any increasing effects from what he ingested.
At about 2:15 a.m., after he had confirmed that the defendant was an official suspect in the murder of Jeanne Robinson, Detective Rosa administered the defendant his Miranda rights. He said he believed the defendant understood his rights at that time. Nurse Aubin then gave the defendant the charcoal drink at about 2:30 a.m. He slept until she had to wake him to take X-rays. She had no difficulty arousing him. He knew his name and where he was. He was a little unsteady in his walk. She said he never worsened while he was at Newport Hospital and essentially was in the same condition when he was discharged by Dr. Gleason at 6:00 a.m. as he was when he was admitted four hours earlier. To Nurse Aubin, the defendant evidenced intoxication based on his speech and gait and balance but that level of intoxication was not anything that she was concerned about. He stood unassisted to dress himself. He signed a consent form releasing his clothes to the police and verbalized his understanding of the release to her. To her, his speech was thick, indicative that he took something, yet understandable. There was no indication that the level of intoxication was going up in his body.
Dr. Gleason said that if Brad had taken 35 klonopin on the bridge, as he said he did, he would have expected him to be sleepier and more difficult to arouse as of 6:00 a.m. As of 3:00 a.m., his urine test was negative for klonopin (which the doctor found surprising). The test does not reflect buspar. The doctor admitted, however, that some or all of the klonopin could have been absorbed into his bloodstream, rather than being present in his urine, depending on when he ingested it. When the doctor discharged him, his condition had not worsened. He was fine to be discharged.
The defendant was taken to the Newport Police station to be booked. He appeared on videotape to be a little out of it, with difficulty keeping his balance. He had to be held a lot of the time to make sure he did not lose his balance. He was quiet and spoke slowly and deliberately. Nurse Aubin reviewed the tape and said his appearance was consistent with how he appeared when he entered and left the hospital. Later in the morning, he was transferred to the Cranston Police station where he was asked to sign a written rights form. He signed his name but had the rights initialed for him. His capacity to understand his rights at that time is unclear. He thereafter made some statements to Detective Falcone, consistent with earlier statements he had made about the killing and his concerns about his personal effects, and ultimately declined to speak without counsel.
 The Crime Scene, the Physical Evidence and the Autopsy Report
An investigation of the crime scene at Jeanne's home began the night of the killing, immediately after Alma Miller's 911 call. Detective Thomas Martin of the ECI unit of the Cranston Police Department responded shortly after 1:00 a.m. to more formally secure the scene and to collect physical evidence and take video and still photographs. He found a pool of blood in the driveway just to the rear of where the defendant's car had been parked. It was consistent with a bloodied head lying at that location. The splatter marks around this location possibly could be indicative of the victim's head hitting the ground with force at that location. He found white fibers along the sidewalk where it meets the grass, consistent with the victim's nightgown. He also found blood evidence further down the driveway (away from the garage) to another pool of blood in the roadway, just north of the driveway, and then a smear of blood in the roadway connecting that pool of blood to another pool of blood in the roadway a little further north. The location of this blood evidence is consistent with a body being dragged against the pavement down the driveway to the first point in the road where it rested briefly, creating a pooling of blood, until it came to its final resting place where the final, larger pooling of blood occurred. The blood in the roadway is consistent with the location of the victim's body, as testified to by Alma Miller, and the direction in which she saw the defendant's vehicle leave the scene.
Inside the house, the detective found a swipe of blood above the handle on the inside of the aluminum breezeway door that leads to the out-of-doors, consistent with something that came into contact with it. There was no blood visible on the artificial turf of the breezeway floor. Inside the kitchen, and near the door that leads from the kitchen to the breezeway, there was a small chair from which items had been knocked off. There was a large police-style mag flashlight, covered with blood, lying on the kitchen floor near that chair. The flashlight measured about 14" long and weighed 2-3 pounds. There was blood spattered across the kitchen floor in droplets. There also was a smear pattern of blood on the kitchen floor. The largest collection of blood was found where the kitchen meets the hallway. At that location, there was blood on the wall, blood splattering from the hall to the kitchen and pooling of blood in the hallway consistent with blood dripping from a level close to the floor from the force of gravity only. The way that the blood was splattered in the kitchen indicates two cast off patterns that could be consistent with multiple blows to the victim with the flashlight when the victim was down. A similar cast off pattern appears on the wall of the hallway.
The master bedroom door, which locked from the inside, was scratched on the outside and evidenced cracked wood around and damage to the striker plate. The scratches on the door are not reflected in a photograph of the bridesmaids taken near the door earlier in the day. There was nothing inside the bedroom to evidence a struggle. The bed covers were mussed and pulled back at around a 45 degree angle. There was no blood evident upstairs.
The defendant's tuxedo shirt seized from the Bain track was missing buttons that were found in his car. The shirt was soaked with blood on the right front and right arm (from the perspective of someone wearing the shirt) and showed other blood evidence on the right sleeve and left sleeve of something bloody brushing against it. Its blood markings are consistent with the person wearing the shirt holding someone against his right chest with his right arm wrapped around the person for a long enough period of time for the blood to soak all the way through the shirt. Many of the other blood markings are consistent with bloodied hair coming in contact with the shirt. The defendant's sweatshirt that was seized showed blood evidence on the inside in the location that would have touched defendant's chest area if he wore the sweatshirt backwards.
The defendant's car was eventually examined after it was put up on a lift. It showed blood on the undercarriage. There was no blood after the transmission pan but white fibers from the victim's nightgown were visible before that area. The blood began to the rear of the front tires. Inside the car were found the ring box with a diamond ring in it, the defendant's wallet, the vest to his tuxedo and a bow tie, a cellphone cord, a zestril pill bottle on the front seat containing 6 buspar pills and numerous zestril pills, and a buspar pill starter kit. There was no pill bottle for klonopin found in the car.
The autopsy report indicated that the victim evidenced blunt force trauma to the head and neck, including a scalp laceration at the vertex of the head, hemorrhage in the deep musculature of the left side of the neck, and petechiae, conjunctivae and sclerae of the eyes. These findings, in the opinion of the Chief Medical Examiner, Dr. Elizabeth A. Laposata, were consistent with blunt force trauma to the head, separate from being run over by a motor vehicle, and manual strangulation. In addition, the victim evidenced blunt force compressive trauma of the torso, including extensive broad abrasions and contusions on the chest and back, abrasions of the bony prominences of the face, a subscalpular hemorrhage, multiple bilateral rib fractures, laceration of the lungs, liver and spleen, pelvic fractures, thermal burns to the right ankle and left knee area, and contusions and abrasions of the extremities. These findings, in the opinion of the Chief Medical Examiner, were consistent with being run over and compressed under a motor vehicle. She determined that the cause of death was the rib and pelvic fractures and lung and liver lacerations due to the compressive blunt force trauma from being run over by a motor vehicle.
The victim's nightgown was removed from her at the time of the autopsy and secured by the police. It was bloodied and shredded, consistent with the victim being beaten and dragged under a car.
 THE DEFENSE OF DIMINISHED CAPACITY
At trial, the defendant admitted that he strangled Jeanne Robinson, hit her multiple times with a flashlight and ran her over with his car. He denied that her killing was done with premeditation or an intent to kill. The defendant asserted at trial a defense of diminished capacity due to intoxication from klonopin prior to the crime.
In support of his defense, he submitted his medical, psychiatric and psychological records from late 1998 and 1999 and his CVS Pharmacy prescription records for 1999. The defense also presented the medical records of the defendant from Newport Hospital, the ACI and the Forensic Unit of the Eleanor Slater Hospital. These records cover the time the defendant was at Newport Hospital (September 19, 1999), the initial time he was at the ACI (September 19-20, 1999), the time he was at the Forensic Unit of the Eleanor Slater Hospital (September 20, 1999 through October 28, 1999) and his return to the ACI (October 28, 1999 through November 2, 1999). These records also include the competency evaluation, dated September 23, 1999, conducted of the defendant at the Forensic Unit by Dr. Barry Wall and Dr. William Brennan. The defense also submitted a photograph of the defendant when he was administered charcoal at Newport Hospital and a videotape of the defendant's booking at the Newport Police Station after his release from Newport Hospital on September 19, 1999.
In addition, the defendant testified in his own defense. Based on his testimony, the defense also presented the reports and testimony of two experts, Dr. Michael Ingall and Dr. Robert Swift.
 The Defendant's Mental Health Records
The defendant's prior mental health records indicate that he started seeing a therapist for anxiety and depression in the fall of 1998, shortly before he got engaged to Jeanne Robinson. Dr. Savoretti treated him in September 1998 for depression with anxiety and prescribed paxil and xanax. In October 1998, Dr. Savoretti indicated that the defendant said he felt much better but that there was room for much improvement. He increased the dosage of paxil and continued to prescribe lorazepam. In November 1998, the defendant indicated to Dr. Savoretti that paxil had adversely affected his sex life and that wellbutrin had not been helping; he was advised to continue wellbutrin and xanax and add elavil. In December 1998, the defendant told Dr. Savoretti that the elavil made him dopey and dizzy so he only took it for a few days and that the xanax was not controlling his anxiety. Dr.Savoretti discontinued the xanax and elavil, continued the wellbutrin and added remeron and klonopin. He advised the defendant to continue therapy with his psychologist and to keep his appointment with his psychiatrist, Dr. Susan DiMase, which the defendant said he had scheduled for January 1999.
Dr. Savoretti's office notes indicate that the defendant canceled his appointment for January 6, 1999, per his fiancee, and did not want to reschedule. Later in January, the defendant told Dr. Savoretti that he saw Dr. DiMase and that she had stopped all medications and put him on serzone, which seemed to be working. The defendant said he did not want to go back to Dr. DiMase because the office would not give him a refill and would not call him back. Dr. Savoretti prescribed serzone, as the defendant requested. There are no medical records in evidence from Dr. DiMase. The defendant saw Dr. Savoretti again in February 1999 and had no complaints; he was continued on serzone for depression and anxiety. He missed his March 1999 appointment.
Around the same time that the defendant failed to show for his March 1999 appointment with Dr. Savoretti, he went to see a psychotherapist, Dr. David Lyon. Dr. Lyon's notes reveal that Jeanne had strongly encouraged the defendant to seek therapy to manage his anger. Dr. Lyon held a joint session with Jeanne and Brad, at which it was determined that Brad's loud and intense behavior, displayed at the session with Dr. Lyon, caused the relationship problems. The defendant denied any alcohol dependency and none was diagnosed by Dr. Lyon. The defendant saw Dr. Lyon for five sessions between March and May 1999, including one joint session with Jeanne. The defendant commented that the behavioral anger management strategies that Dr. Lyon taught him were working. In June 1999, the defendant saw Dr. Savoretti again and reported increased anxiety. At the defendant's request, Dr. Savoretti increased his serzone. The defendant never returned to Dr. Lyon and missed his appointment scheduled with him for mid-July.
On July 21, 1999, the defendant saw Dr. Joel Medwin. He talked to him about his conflicts with Jeanne and stress from her children. He said he did not like to be alone on weekends. He said he had a history of drug treatment for anxiety and was currently taking serzone. Dr. Medwin referred him to Dr. Laura Fixman, a psychiatrist. On July 22, 1999, the following day, the defendant returned to Dr. Medwin for an urgent visit connected with an alleged exacerbation of anxiety. The defendant was anxious for a psychological evaluation had been scheduled for July 28, 1999. Dr. Medwin urged him to call his primary care physician, Dr. Savoretti, to get temporary medication, but Brad refused, saying that Dr.Savoretti had already prescribed several medications with no benefit. Brad presented as very angry and anxious.
On the following day, July 23, 1999, the defendant went to see Dr. Savoretti and told him that he had been very anxious and depressed for the past several weeks. For the first time, Dr. Savoretti diagnosed not only anxiety and depression but also panic and anger. Dr. Savoretti advised him to take his prescribed amount of serzone, as he was supposed to be taking it, and added elavil and klonopin. He told him to keep his scheduled appointment with Dr. Fixman. Dr. Savoretti prescribed klonopin at a dosage of 1-2 tablets of 0.5mg twice a day, as needed, for anxiety. The defendant filled that prescription for klonopin (60 tablets) that day.
On July 23, 1999, the defendant saw Dr. Laura Fixman, a psychiatrist, for the first time. He told her that he was taking klonopin and serzone. She reported that although he reported that his mind was racing and he was apprehensive, there was no clear stressor and he was not depressed. He indicated that he had an up and down relationship with his fiancee and that their relationship was too stormy to set a wedding date. He said he did not like to spend his weekends alone. He told Dr. Fixman that he gets angry easily and kicked in the door again drinking. He called Jeanne's children leeches and said that Jeanne was more financially involved with them than he would like her to be. He said he hit the screen again after three drinks and that he kicked the door in once when drunk. He said he drank socially three to four times per week and that he last drank three drinks about two days ago. He said he drank as much as four drinks on weekend days. Dr. Fixman noted that he had a generalized anxiety disorder and that she wanted to rule out alcohol abuse. She noted that he spoke about temper problems with alcohol and thought he might be minimizing his alcohol use. She continued the defendant on klonopin and serzone but wanted to consider prescribing remeren or buspar instead of serzone. She advised him not to drink.
On July 28, 1999, the defendant saw Dr. Medwin and told him that he was feeling calmer but was concerned about feeling drugged. He was hopeful he could balance the extremes and rebuild his relationship with his girlfriend. That same day, the defendant saw Dr. Fixman again and could not walk straight and appeared drugged. Dr. Medwin made no such notations. The defendant told Dr. Fixman that he had been weaving Friday night and was sleepy all weekend. He said he was in a deep hole. He said he had been taking his klonopin and serzone and that he had no alcohol. He insisted that he had been taking serzone for 10 months. She decreased his serzone and klonopin.
On August 4, 1999, the defendant saw Dr. Medwin again and reported stability with no significant verbal aggressiveness and decreased anxiety. That same day, he saw Dr. Fixman and reported that he had taken the serzone for four or five days but that it was no good. He said he had not taken any klonopin over the past two days (since he got a "head buzz" the day before), and he had consumed no alcohol. He said he now felt tense. She discontinued serzone, prescribed buspar (15 mg/ two times per day) and suggested klonopin (1-3 tablets of 0.5 mg per day, as needed). She wrote him a prescription for buspar, 60 tablets, with one refill. He filled the prescription for buspar that day.
On August 6, 1999, the defendant saw Dr. Savoretti and reported that he was feeling much better. He said he had seen Dr. Fixman and that she had changed his medications. Dr. Savoretti advised the defendant to continue buspar at a dosage of 15 mg. two times per day and to take klonopin at a dosage of 0.5mg two times a day as needed, per Dr. Fixman. He noted that the defendant was no longer taking serzone or elavil.
In his weekly appointments with Dr. Medwin during the balance of August 1999, the defendant reported that he was more stable, less anxious, and pleased by his progress. He said that his relationship with Jeanne was much improved. During his appointment with Dr. Fixman on August 18, 1999, the defendant indicated that he was taking buspar two times a day and klonopin and was calmer with no flare-ups. He said he occasionally got a fuzzy feeling in his head and felt better if he ate with the medication. He thought the medications were working and his girlfriend was seeing him as a lot calmer.
There are no records of any visits with Dr. Medwin, Dr. Fixman or Dr. Savoretti for September 1999. It is unclear whether the defendant had any appointments scheduled with them prior to the day of the crime.
 The Defendant's Prescription History
The defendant filled his prescriptions at CVS Pharmacy on Atwood Avenue in Cranston, Rhode Island. His prescription records show that he filled prescriptions for serzone (for depression and anxiety) and zestril (for blood pressure) on a monthly basis in 1999. His filled his last prescription for serzone on July 18, 1999 (120 tablets), as prescribed by Dr. Savoretti. Dr. Fixman advised him to discontinue the serzone on August 4, 1999.
The records also show that the defendant filled his first prescription for buspar (30 tablets) on August 4, 1999 and renewed it (30 tablets) on August 19, 1999, as prescribed by Dr. Fixman. If he took the buspar as prescribed, he would have been out of it well before the date of the crime. He filled his first prescription for klonopin on July 23, 1999 (60 tablets), as prescribed by Dr. Savoretti. He renewed his prescription for klonopin on August 13, 1999 (60 tablets). The pharmacy records for that renewal carry a dosage of 1 2 tablets, 2 times a day as needed for anxiety, attributed to Dr. Savoretti. At a rate of two tablets per day, he would have been out of klonopin as well before the date of the wedding.
 The Defendant's Records from the ACI and the Forensic Unit
Upon the defendant's commitment to the ACI on September 19, 1999 at about noon, the nursing contact notes from the ACI records indicate that a nurse was called to the committing room to see the defendant. The nurse wrote that the defendant told her that "he had ingested a full bottle of klonopin" (with the number of pills uncertain) and that he also had made two other attempts to take his life. He told her that he was seen at Newport Hospital and given charcoal for his pill ingestion. His right hand had a contusion and was swollen and tender to the touch.
Later that day, at about 4:00 p.m., the defendant was resting and seen shortly thereafter by a prison social worker. He told her that he tried to jump off the bridge. She noted that he had been monitored since his commitment secondary to his suicide attempts, namely an overdose of klonopin and an attempted jump from bridge the day before. She noted that he seemed somewhat lethargic secondary to klonopin, had active suicidal ideation with recent attempts, but appeared comfort oriented and had eaten. She noted he was sad, with a blunted affect.
At 10:00 p.m. that night, the staff performed a medical entrance screen. The defendant indicated that he had imbibed no alcohol for two years, that he was taking buspar twice a day and klonopin as needed but that he was unsure of the pharmacy, that he had anxiety, that he had suicidal thoughts and that he had taken "about 40 klonopin yesterday." The nursing staff noted that he had a quiet, flat affect during the interview. About 45 minutes later, he put his head in the toilet in an apparent suicide attempt and was placed in two-point restraints.
At 5:00 a.m. the next morning, on September 20, 1999, he saw Dr. Bauermeister, a prison psychiatrist, whose notes suggest "klonopin, bridge, Newport Hospital, ACI." The defendant told him that he had been seeing Dr. Fixman for 3-4 months, that he had tried serzone but it was not mixing well with alcohol, that his family doctor had prescribed klonopin, but that he was now on buspar. He promised not to hurt himself if the restraints could be removed. He was depressed, tearful and said he wanted to die. He was prescribed buspar (15mg twice a day) and klonopin (0.5 mg) as needed; but the medication records do not indicate that he was ever given klonopin.
Later in the day on September 20, 1999, the Court ordered the defendant transferred to the Forensic Unit for further evaluation, given his threats of suicide. From the moment of his transfer, he had no further thoughts of suicide. He indicated only that he would commit suicide if he went back to the ACI. During his initial psychiatric assessment at the Forensic Unit on September 20, 1999, he indicated again that he had taken 40 klonopin. He was asked whether he was currently taking any psychiatric medications or had recently discontinued any. He did not list klonopin in either category. As to current medications, he listed only that he had taken buspar twice a day for 5 months. His pharmacy records were obtained, indicating prescriptions for buspar, klonopin and zestril. On his mental status examination, he wrote "I am very sorry for what I did to Jeanne Robinson." He was ordered to take buspar, zestril and klonopin as needed for acute anxiety, but the medication records do not show that he was ever administered the klonopin. A urine toxicology screen done thereafter, on September 21, 1999 at 6:30 p.m., was positive for benzodiazepin (the category of drugs in which klonopin is found).
On his treatment plan, developed on September 22, 1999, it was indicated that he had a problem with non-compliance with medication treatment. That same day, he was prescribed two additional medications: paxil (an anti-depressant used to treat anxiety) and depakote (a mood stabilizer). In addition, random drug screens were ordered. He disagreed with the determination that he was non-compliant with his medications. He stated that he was compliant in taking his medications previously on an out-patient basis, even though his fiancee would advise him not to take the medication. He would tell Dr. Savoretti what his fiancee advised.
Later, in a substance abuse screening test administered on October 1, 1999, the defendant denied any drug or alcohol use or abuse, stating that he had never honestly experienced any of the following difficulties from using alcohol or drugs: black outs, problems understanding, concentrating or remembering, problems controlling violent behavior, suicide thoughts or attempts, problems with work or family, or increased anxiety. He attributed his anxiety to not using alcohol or drugs. He was noted to be guarded in responding to the test due to his legal status.
 The Defendant's Competency Evaluation
A competency evaluation of the defendant, dated September 23, 1999, was done by Dr. Wall and Dr. Brennan at the Forensic Unit of the Eleanor Slater Hospital based on their review of Forensic Unit records, discussions with his treatment team and interviews with the defendant on September 22, 1999, September 23, 1999 and September 27, 1999 over three hours. It indicates that the defendant was sent to the Forensic Unit from the ACI after he attempted to drown himself in a prison toilet. In the course of the evaluation, the defendant talked about his first marriage which quickly ended in divorce because he was "drinking, partying, raising hell, and we just didn't get along." He said his second marriage lasted for 18 years and ended in divorce at his wife's request. He then talked about his relationship with Jeanne as often rocky. "She got me going to doctors, to start taking pills, so I could calm down, it wouldn't take much to set me off. . . . I was always tense, she wanted to be quiet. . . ." He mentioned two prior episodes of suicidal thoughts: once in response to financial problems with his second wife and the second time involving an argument with Jeanne. He talked about a history of drinking and how it interfered with his relationships, especially with his first wife. He said he drank heavily in his twenties and thirties, but had not had anything to drink in the past couple of months. He talked about being in therapy for anxiety and being prescribed paxil, serzone, prozac and more recently buspar (which did not help) and klonopin.
In describing the circumstances leading up to the wedding, he said he felt overwhelmed at the prospect of meeting Jeanne's ex-husband and his brother. At the wedding, he indicated that he was taking 3-4 klonopin at a time, every hour or so. He said that the pills did not seem to be doing much so he kept going back to the car and taking more. Finally he took the whole bottle of pills because he felt so uptight.
The defendant then said that he drove erratically on the way home from the wedding. He claimed Jeanne was screaming at him and he was really out of it. He would not discuss the details at Jeanne's house thereafter. He then said that after he left the house, he drove to the Newport Bridge. He called his sister on the way and told her he was going to jump. He said this sister alerted the Newport Police Department and called their other sister. The defendant said that he got out of his car at the top of the bridge, took the rest of the buspar and went out on a girder. He threw the cellphone into the water. He said Frank Rosa, a friend on the Newport Police force, lured him off the bridge. According to this interview, the next thing he remembers is being at the Intake Center at the ACI. He said he wished he had jumped and that if he had to go back to the ACI, he would kill himself.
According to Dr. Wall, the defendant demonstrated the ability to cooperate with an attorney. The defendant said "I want to make sure that they understand that I have a chemical imbalance — that's what my psychiatrist told me." Drs. Wall and Brennan concluded that the defendant was competent to stand trial, and they diagnosed him with an anxiety disorder and an adjustment disorder. They believed he could return to the ACI.
 The Defendant's Interview with Dr. Ingall
On October 2, 1999, Dr. Michael Ingall interviewed the defendant at the ACI. Dr. Ingall eventually would become an expert witness for the defense at trial. In his interview with Dr. Ingall, the defendant was extremely anxious but also remorseful. He indicated that his relationship with Jeanne was a stormy one. He said they would argue about her children. He felt the children were "leeches" on whom she spent inordinate amounts of money which he considered wasted. He talked about the problems surrounding Jeanne's son. He said Jeanne would respond to his complaints about her children by telling him that he did not understand because he had never had children. She told him that "if you want me, you get the whole package." He said that they had broken off their engagement once before, and she had thrown the ring at him then. Yet he said he loved her throughout, as he had never loved anyone else in his life. He said "she was so good."
In the interview with Dr. Ingall, the defendant also talked about the wedding day. He said Jeanne had been telling him about how anxious she was for him to meet her ex-husband's brother who sold trucks in Texas so perhaps the two of them could link up on the Internet for business purposes. He kept telling her repeatedly that he did not want to meet the man or anyone else from her ex-husband's family. He dreaded speaking with any of them and was filled with apprehension and physical tension about doing so.
The defendant also talked in the interview about his medications. He indicated that he had been taking buspar regularly and klonopin as needed for anxiety over the preceding two months. He said the buspar did not help and the klonopin did not work as well as it did in the beginning. He said he took approximately two tablets of klonopin every day. On the Friday before the wedding, he said he took three klonopin during the day and two during the rehearsal dinner. He described that irritability from an attack of anxiety makes him prone to outbursts of yelling and swearing.
He then talked about the wedding day itself. He told Dr. Ingall that he began taking 3-4 tablets of klonopin at a time, beginning at 10:00 a.m., because of his anxiety. He estimates that he had about 40 klonopin tablets in a bottle prescribed by Dr. Savoretti. At the reception, he stated that he would go out to his car every hour or so to take a few more klonopin. He estimates that by the time he left the reception, he had taken about 25 klonopin.
On the way home from the reception, he and Jeanne began to argue. She was angry that he did not want to meet her ex-husband's family. He was driving erratically and heard branches brushing against his car. He said he felt as if he were in a fog. He said Jeanne asked him if he had been drinking. He told her that he had not been drinking and had not had anything to drink since Dr. Fixman advised him, two months before the wedding, to stop drinking.
He then said that his argument with Jeanne escalated in intensity. When he pulled in the driveway and they got out of the car, she took off her engagement ring and threw it at him. He went into the house to get a flashlight since he could not find the ring on the ground. Jeanne kept a metal flashlight beside her bed, but he could not recall if she gave it to him or whether he went upstairs to get it. He looked for the ring with the flashlight and found it. He said he then went into the downstairs closet to find the box for the ring, found it, put the ring into the box and put the box into the glove compartment of his car.
He then went back in the house, found the door to Jeanne's bedroom locked, forced the door open and found her in bed in her nightgown. He said they were yelling at each other and he grabbed her around the neck and strangled her. He said he felt out of control. He let her go and she got up and went down the stairs. He followed her and once they were downstairs, he hit her on the head 3-4 times with the flashlight. She pushed him down and ran outside yelling for help.
He then followed her and grabbed her from behind around the chest. He said he felt her slip to the ground. He got into the car to leave and, as he was backing up, the car stopped as the wheel hit something. He pulled ahead and then backed up again, out of the driveway. After he turned the corner, he said he heard a noise from the wheel, stopped the car, got out, and saw that the mud flap was bent. He straightened it. He noticed that his shirt was covered with blood so he took it off and threw it on the ground. He put on the sweatshirt he had in the trunk. He said "I just wanted to get out of there. I thought the worst."
The defendant told Dr. Ingall that he then headed for the Newport Bridge. He took a few more klonopin as he was driving. He said he called one of his sisters saying that he thought that he had killed Jeanne and he was going to jump off the bridge. He wanted her to send help for Jeanne. "I figured something bad had happened. I loved her." He said his sister then called the Newport Police and his other sister.
At the top of the Newport Bridge, the defendant said he stopped, turned on his flashers, swallowed the rest of the klonopin in the bottle, left his watch and wallet in the car and climbed out onto a girder. In his interview with Dr. Ingall, the defendant remembered his friend, Officer Rosa, showing up and telling him that he had thought that he killed Jeanne and that he had run over her head twice. The next thing he remembers is waking up with an intravenous needle in his arm. He does not remember being taken to the ACI. He does not recall being interviewed by Dr. Bauermeister at the ACI.
 The Defendant's Trial Testimony The Defendant's Prior Marriages
At trial, the defendant testified on direct examination as to his prior marriages. He said that his first marriage dissolved due to irreconcilable differences. He talked about his past history of drinking and how it broke up his first marriage. He said his first wife "could not get along with my drinking." He said drinking would make him behave erratically, out of control, and angrily. He said that his second marriage lasted for eighteen years because his drinking was a lot less.
On cross-examination, when asked if he hit his first wife, he said he gave her a back hand. He denied choking her and when asked if he drove her to the bridge, he said he could not recall that but that he would not deny it. When pressed as to whether he was now saying that he did not recall driving her to the bridge, he said, "I am not sure that is what I am saying now." He denied that she was really injured. He admitted taking her to the hospital but would not concede that she was so injured that she had to go there. He admitted calling her a lying son-of-a-bitch when he spoke about her with Dr. Wall, but denied that it was a term he used frequently.
 The Early Years with Jeanne
The defendant further testified on direct examination that he met Jeanne in 1997. He described their relationship as "on again, off again." He said that when he drank, they would have loud arguments. He said that they got engaged before Thanksgiving in 1998. Even after that, they continued to have their problems. Jeanne got him to see Dr. Savoretti, Dr. Lyons, Dr. Medwin and Dr. Fixman about his temper. It was about the time he saw Dr. Savoretti in June 1999 that he stopped drinking. In August 1999, they had another conversation about his temper and Jeanne gave him the ring back. As a result of that problem. he said he went to see Dr. Fixman.
On cross-examination, he had to concede that he met Jeanne in the summer of 1996, rather than 1997. When he was confronted with Dr. Fixman's note from the summer of 1999 that said "he gets angry easily, kicked door in again," he denied that he had kicked the door in more than once. The note also said that he "hit the screen again," but he said that was a different time than kicking in the door and that it was after they had been dating for quite awhile. He said they had been arguing and he had been drinking. He said they argued frequently. When asked what they argued about, he first mentioned Jeanne going to the casino with Josee and without him. He said he would always call her a few times a night when she was away from him having fun. He denied it was to check on her. He said they also argued about her children because Jeanne said he had to accept them along with her. The defendant admitted that he did not want to accept them because they were not his children. When asked what else they would argue about other than her kids and the casino, the defendant referenced the argument before the wedding about her taking her medication. He acknowledged that she did not want to take the medication so she could enjoy the wedding, but was adamant that was not an excuse because she needed her medication. When asked again what else they argued about, he said that was about it. He then had to admit that they also argued about his temper.
On cross-examination, the defendant admitted to an incident, referred to by witnesses in the state's case-in-chief, when he kicked in Jeanne's door from the breezeway into the kitchen. He admitted that they had been arguing earlier in the evening at her house. He said he left but called her a couple of hours later. She told him she would be leaving and his clothes would be out in the hall. He went to her house, mad and upset, and kicked in the door and got his clothes. He said she was not home because she had said she was going out. He thinks she said she was going to the casino alone. He said he had been drinking heavily at the time. He then said he called her that night or the next day to apologize, but she was not home. He kept calling and leaving messages of apology on her machine. He said by the time he called her, he had calmed down and had not been drinking.
After this testimony, the defendant was confronted on cross-examination with an answering machine tape that Jeanne ironically had saved of Brad's repeated messages of "apology" dated March 9, 1997, the day after the incident. Seeing the tape coming, he admitted for the first time that he and Jeanne began dating in August of 1997, rather than August of 1996 as he had testified to earlier. (His divorce from his second wife was not final until 1997.) The tape hardly reflected a series of apologies. It contained a series of ten consecutive phone calls where Brad repeatedly swore at Jeanne in disgustingly vulgar language, demeaned her, hung up and then called back repeatedly to start all over again. He first swore at her about her saying he was wrong. He next complained that she was not picking up the phone, he swore at her again and he then said he wanted his clothes. He suggested she go back to her old boyfriends and said there was no one in the world who could satisfy her. He suggested that was why her husband left her. He chided her that everyone is wrong but her. He accused her of fooling around with someone else. He said he was sorry he fell in love with her. Interspersed in all of these messages were expletives, with the defendant repeatedly calling Jeanne a son-of-a-bitch, or worse, in every call. The defendant's voice on the tape was angry, mean-spirited and matter of fact; there was no sense that he was intoxicated.
During the playing of the tape, Brad evidenced no emotion or expression. He had his explanation ready: "I had been drinking." He was quick to say that he remembered making all of those calls from a tavern and then changed his story again. He said he could not remember making all of the calls because he was pretty well looped that night. When he was asked how much he had to drink, he said probably six or seven Absolut vodka drinks with 7-Up. He then said that these were not calls of apology after the fact but were the calls he made before going over to Jeanne's house and kicking in her door. He was asked if he were angry and he replied that he was aggravated. He ultimately conceded he was angry when he kicked the door in.
 The Defendant's Medications
The defendant testified on direct examination that Dr. Savoretti first prescribed klonopin for him on July 23, 1999, even though his medical records record him prescribing it in December 1998. His prescription was for 1-2 tablets, 2 times a day, as needed for anxiety. After that, the defendant told Dr. Fixman that the klonopin was not working. According to the defendant, Dr. Fixman told him to take it as much as needed. He did not recall if he discussed Dr. Fixman's recommendation with Dr. Savoretti.
On cross-examination, he acknowledged that Dr. Savoretti first prescribed klonopin for him in December 1998 but took him off of it because it was not working. He could not recall when he stopped taking klonopin the first time or how much he took. He speculated that he was taking it every day, probably 2-4 tablets per day. He said it was not working because it did not relieve his stress. He felt stress from his job, from different things like that, and from arguing with Jeanne. He said Jeanne had a stressful job that caused him stress. She worked so much and had a responsible stressful job as Director of Nursing.
The defendant testified on direct examination that he had his first prescription for klonopin filled at CVS Pharmacy on July 23, 1999 and that he obtained a bottle with 60 tablets in it. He said that he refilled the prescription at CVS on August 13, 1999 and obtained another vial of 60 tablets. He indicated that he had all of his prescriptions filled at the same pharmacy. The CVS Pharmacy records in evidence for 1999 confirm these two prescriptions for klonopin and the amounts as testified to by the defendant. The defendant further testified that, at the time he refilled the klonopin prescription, he still had pills left over from the first prescription. He said he put 25-30 pills from the first prescription vial into the vial of 60 pills from the second prescription, which would have given him a total of 85-90 pills as of August 13, 1999.
The defendant then testified that he took the klonopin as needed. He indicated that he took about 15 pills in July. He could not say how many pills he took in August, but only that he took some. He said that the vial for klonopin was not empty by the end of August. The defendant said the klonopin seemed to work but that it would make him dizzy. He never told anyone that it made him dizzy. The defendant testified that at the beginning of September, he had about 60 pills left. By that calculation, he would have taken an average of about one or two pills a day for August. In September, he testified to taking a few pills before taking Jeanne to the emergency room and a few after he got there. He also said that he took 2-3 klonopin before the rehearsal dinner and that it made him feel light-headed. He still felt anxious but not agitated. He otherwise gave no testimony about his level of klonopin ingestion in September.
On cross-examination, the defendant admitted that he took 45 klonopin tablets in August which would average out to 1-2 tablets a day. He said he took it fairly regularly in August, but not every day. He said he would take it when his anxiety would build up. If he felt a bit aggravated, he would take a couple; if he felt really aggravated, he still would take only a couple. He never took more than four klonopin per day. He admitted that August was a stressful time at work and with Jeanne. When pressed, he could not remember what stressed him out in August about Jeanne other than her being sick throughout the year. When prompted, he then admitted that the wedding caused him stress. He said he knew it was to be the biggest day of her life, and he knew that he wanted nothing to do with it.
 The Weeks Before the Wedding
The defendant denied knowing anything about an event in August that would have prompted Jeanne to call her sister Patty and talk about her getting a restraining order against him. When asked when it was that Jeanne first gave him the ring back, he said August 1999, about three weeks before the wedding. He said she gave it back because his anxiety was running wild. He had gone back to see Dr. Fixman to see what she could do. He confessed that when Jeanne gave him the ring back, she said that she did not think she could marry him. She had threatened to give it back before, but this time she did it. She did it face to face "probably in her kitchen or in the house somewhere." He said that they then continued to see each other and she asked for the ring back just before the shower. He was not concerned that he might not get back the expensive ring that had put him in debt because she had told his mother that she would give it back anytime if it did not work out. When he was asked how many klonopin he took the day she gave him the ring back, he said he could not say. He could not say if he took klonopin that day even though he was upset. He admitted that he had spent a lot of money on Jeanne but that they had no wedding plans or plans about what they would do once married.
 The Wedding Day
On the day of the wedding, the defendant testified that he took 3-4 klonopin right after he got up at 6:00 a.m. He went the Jeanne's house a little after 7:00 a.m. and took "a few more, a couple of klonopin." He said he kept them in the console of his car, but he put the vial in his pocket and took them in the house. He admitted on cross-examination that it was at this time that he first criticized Jeanne's hair. He confessed that it was one of the first things he said to her that morning. He said on direct examination that he then got back in the car and put the klonopin back in the console. He went to Bristol around 8:30 a.m. to make sure the reception was set up properly and stopped for breakfast with Joel and Vanessa. The defendant said he took the pills out of the console and put them back in his pocket and took a few more at breakfast. He said he opened the pill vial under the table so no one would see him. He claimed that at this time he was feeling a little dizzy and light-headed. He then checked out the reception hall and then went to Portsmouth to pick up his mail and check his mail at his mother's house. It was about 11:00 a.m. and he took another pill there, from his pants pocket, while Joel and Vanessa were still in the car.
When he returned to Jeanne's house, around noon, the defendant testified that he had an argument with Jeanne over her hair. He told her he was not going to the wedding and left the house. Jeanne said "well, if you don't want to go, stay home." He thought Jeanne's niece, Kelly Anderson, might have been around at this time. After the argument, Brad said he left and went home. He called Jeanne from his cellphone and again when he got home to apologize and tell her that he would go to the wedding.
Brad stayed at his apartment for about two hours and got dressed in his tuxedo for the wedding. He said he took 3-4 more klonopin. He then stopped for ice and beer and returned to Jeanne's house. He got back there after 2:00 p.m. He set up the ice and beer in the back yard with Josee Davis. He denied having a beer with her and said that he got a Sprite. He took the golf clubs out to his car. He said he also took some more pills in the bathroom and that no one saw him. On cross-examination, he admitted that he did not want to wear the tux and that he did not want to go to the wedding, but he knew it meant a lot to Jeanne.
The defendant then began talking about the wedding party getting ready to leave the house. He interjected at this juncture that before they left the house, he took a pill inside the house and Jeanne saw him taking that pill. According to the defendant, she said "they are going to knock you down by taking the pills." He said he then went outside and took pictures of Alma Miller's grandchild with Jeanne and Jendra before the limousine left.
Brad said that he then drove Jeanne and Josee to the wedding. He said he took one klonopin in the car. Jeanne said "it's going to knock you down because you just took one a little over half an hour before." He said when he got to the reception, he took a few more pills once Jeanne and Josee were out of the car. He returned the bottle to the console. He said he took no klonopin during the wedding or in the receiving line, but after the receiving line was over, he said he went out to his car and took some more klonopin.
The defendant testified that he sat at the table for dinner and did not eat. Once during dinner, he went out to the car and got some more klonopin. He said his anxiety was building up because Jeanne wanted him to meet her ex-brother-in-law and talk about doing business with him. After that, he felt anxious and went out to the car and took some more klonopin and then returned to take some pictures. While the cake was being cut, Brad said he went out to the car and took 3-4 more klonopin. While people were dancing, he said he went out to his car and took some more pills.
On cross-examination, the defendant said that Jeanne kept wanting him to talk to Wayne's brother. She would not back off. He admitted that she wanted him to meet someone from her past, someone that was special to her at one time and someone with whom she shared children. He did not want to do that because he wanted no part of her past. He admitted that he could not do that for her — not to meet her past. He admitted that the more insistent she got, the more upset he got. He said she would not even let up as they danced. She kept saying please, and he kept saying no. He wanted to leave and wanted no part of meeting Wayne's family. He was tired of her pleading with him. And he never gave in.
On direct examination, the defendant next testified that the wedding reception ended and he helped put the gifts in Wayne's truck and the decorative lights in his trunk. He testified that he had no trouble doing any of that but that he felt light-headed and dizzy. He talked about the conversation that he had with Jeanne's brother, Albert Girard, Jr., while he was putting the lights away. The defendant said that Albert asked him if he were able to drive and if he were interested in going fishing with him. When counsel asked the defendant if he knew why Albert had asked him if he were able to drive, the defendant replied that he had told Albert in a comment that he had been drinking a lot of 7-Up. The defendant thought that perhaps Albert had asked him if he had been drinking, and he told Albert that he had not had any drinks but that he had taken tranquilizers. The defendant said he told Albert that he thought he was looped from too much Sprite.
 The Ride Home
The defendant testified on direct examination that he left the reception around 10:30-11:00 p.m. He drove Jeanne and Josee back to Jeanne's house. On the way home, he said that he was in the high speed lane riding close to the berm and Jeanne hollered at him to pull the car back over to the right. He said on the way home, he felt dizzy and light-headed. He said he took one klonopin on the way home. He also said Jeanne was upset in the car because he would not meet her ex-family. She told him that when Josee went home, he should go home for the evening because she was tired. He did not say anything in response. He testified at trial that her request did not upset him.
 Back at Jeanne's House
On further direct examination, the defendant testified that when they got back to Jeanne's house, Jeanne and Josee got out of the car and Josee took her belongings out of the car. He said that Josee then went into the house to get her keys. The defendant said that he remained behind the wheel of his car, parked up close to the garage. Josee then came out of the house and Jeanne followed her to her car to say goodnight. When asked where he was at that time, the defendant said he was "in the car, up by the car, in the car." He said he never got out of the car while Josee was there.
After Josee left, he said Jeanne came around and got her belongings off the floor of the car, then came around to the front of the car and threw the ring at the defendant. She just said "here is your ring." She told him to go home. He said he was upset. When asked what he meant by upset, he said he was trying to find the ring. He did not know where it went. After Jeanne threw the ring, he told her he needed a flashlight. He said she brought him out a flashlight and he got down on his hands and knees looking for the ring over by the edge of the house. In attempting to explain why she would possess a big police-style flashlight, he said he gave it to her when there was a storm because he had one like that and she kept it in her bedroom stand.
He testified further that when she came back with the flashlight a couple of minutes later, she had her nightgown on. He said he finally found the ring in the basket of twinkle lights he was holding when she threw the ring at him. He was upset, but not as upset as when he called her in March of 1997. He said he then went in the house and got the box for the ring that was in the hallway closet. He knew it was there because that is where he put the box when he gave the ring back to her a few days before the reception or the shower in September 1999. The defendant said he then put the ring in the ring box and put the box in the glove box of the car. Jeanne was upstairs while he did all of this. He said he then "finished off the rest of the klonopin he had in the bottle." He estimated that there were 5-6 left. He said he took it because he did not want to get aggravated going in to talk to her.
The defendant said he then went back in the house through the breezeway. Neither the breezeway door to outside nor the breezeway door to the kitchen were locked. He said Jeanne left the door open when she brought him the flashlight. He wanted to talk to her. He said that he wanted to see if they could resolve the issue about his not meeting her in-laws. He went upstairs, grabbed ahold of the bedroom door and found it locked. He had never found her door locked before. He said he sat at the top of the stairs and pleaded with Jeanne to let him in. She said she would not let him in and told him to go home. He did not go home because he wanted to talk to her. He thought she was wrong for trying to force her ex-in-laws on him. He was going to try to explain that to her. He wanted to tell her she was wrong. But when she would not let him in, he got up, put his foot up against the door and kicked it right in. She was sitting on the bed in her nightgown looking startled. She said nothing. He pushed her back on the bed, got on top of her, and started choking her. He denied thinking about choking her and said nothing before he did. He squeezed her neck and she gasped and made gurgling and growling noises. She could not breathe. He then got right off of her and she got up and went downstairs. She was crying and wanted to know why he did it. He did not answer her.
He testified that Jeanne then walked downstairs and he followed a couple of stairs behind her. She was not talking. She went in the kitchen, got a glass of water and started crying, asking him why he did it. Brad said he did not respond. He said he just stood there looking at her and waited. She was crying and asking him why it happened. He said he did not know what he said to her. He said he then put his arm around her and picked up the flashlight and hit her with it in the head three times. The flashlight had been on the table in the kitchen. He said he did not plan to hit her with the flashlight. After he hit her a few times, he fell down and he thinks she went down, too. When asked on cross-examination if he were more upset with her at that point than he was on the answering machine tape from March of 1997, he said no. When he was asked if he were calmer than that, he said he was dizzy, but he acknowledged that he knew he hit her. When he was asked if he were more intoxicated when he made the calls than on the day of the wedding, he said yes.
The defendant next testified that after he hit Jeanne, she got up and went out in the driveway. On cross-examination he said she "got up and walked or ran — she ran outside." He heard her holler "help me, help me" in a soft voice. He said nothing, but followed her outside. He said he then put his arms around her to bring her in. He did not know where he put his arms. He said he could not say if he put her on the ground. He denied shutting her up. He said he did not know what happened. He said the next thing he did was to get into the car. He did not know where she was in relation to the car. He said he started to back out of the driveway, the car stopped, he pulled forward and then he put the car back in reverse and backed up out of the driveway. He said he could not tell the Court whether she was under the car. He said he headed down Fiat Avenue and heard a mud flap or something dragging. He said he did not stop to see what it was. He never looked in his rear view mirror. He did not call 911, the police or the rescue from his cellphone for help because he did not know where she was. He said he was out of it at that time. When he got in the car, he said he had blood on his shirt and on his hand. He then said he first noticed the blood when he was heading down the street. He pulled around the corner from Fiat Road, near the Bain track and just tore off the shirt and left it by the side of the road. He said he took it off because he could not stand the sight of blood.
 After the Crime
The defendant next testified on direct examination that he recalled nothing else (including the cellphone calls he made to his sisters) before he saw a sign for the Newport Bridge. On cross-examination, however, he admitted calling Jeanne's house and not getting an answer and punching in the buttons to call his sisters. He recalled throwing tokens into the toll booth and driving up the bridge. He said on direct examination that he did not recall stopping on the bridge or getting onto a cable on the outside of the bridge. On cross-examination, however, he admitted to recalling stopping his car on the top of the bridge and putting his flashers on and getting out. He also admitted to talking to Detective Rosa on the I-beam. He said on direct examination that he did not recall speaking to anyone else besides Detective Rosa on the bridge and that he did not recall anything he said to him. On cross-examination, however, he acknowledged that he told Dr. Ingall about his conversation with Detective Rosa on the bridge wherein he told Rosa that he thought he had killed Jeanne and run over her head twice.
On direct examination, the defendant also said that the next thing he recalled after being on the bridge was waking up with an IV in his arm. He said he did not know where he was at that time and did not recall speaking with anyone. He said he thought it was a hospital. He said he next recalled being at the ACI and recalled nothing about the hospital or the police stations in between. He said that he did not tell anyone that he did not know what he was doing, and no one asked him if he knew what he was doing. He said he loved Jeanne Robinson and never planned to kill her. He testified that he never thought about killing her. He admitted taking her life but claimed it was not intentional.
On cross-examination, he discussed his pill-taking on the bridge, even though he had testified on direct examination that he had no memory of even stopping on the bridge. He said that he finished the pills in the car before he got out of the car and onto the bridge, that those pills were buspar and that buspar pills are what Cindy heard him swallowing. He said he took the buspar because he just wanted to end it. Even though he told Dr. Ingall that he took a few more klonopin as he was driving, he said on cross-examination that he took buspar as he was driving because the klonopin was all gone.
 The Expert Testimony of Dr. Ingall
To buttress his defense of diminished capacity, the defendant next presented the expert testimony of Dr. Michael Ingall, a noted expert in psychiatry. As outlined in his report and his trial testimony, and as is described in detail above, Dr. Ingall interviewed the defendant on October 2, 1999. This interview was critical to Dr. Ingall's analysis. Dr. Ingall also reviewed the following records in connection with the preparation of his final expert report and trial testimony: defendant's medical records from Dr. Frank Savoretti from February 1997 to August 6, 1999; the defendant's psychological records from Dr. Joel Medwin, a psychologist, from July 21, 1999 through August 31, 1999; the defendant's psychiatric records from Dr. Laura Fixman, a psychiatrist, from July 23, 1999 through August 18, 1999; the defendant's prescription history from CVS Pharmacy for 1999; the records from the Newport Hospital Emergency Room on September 19, 1999; the trial testimony of Dr. James Gleason, the emergency room physician on duty that night, in connection therewith; certain records from the medical unit of the ACI from September 19-20, 1999; certain records from the Forensic Unit of the Eleanor Slater Hospital sometime on or after September 20, 1999; the competency evaluation of the defendant, dated September 23, 1999, which was prepared by Dr. William Brennan and Dr. Barry Wall from the Forensic Unit; certain police statements, including statements of Officer Frank Rosa and Trooper Simon Liu; certain witness statements, including statements of Josee Davis, Alma Miller, Debbi Pappas, and Cindy Edwards; a videotape of the wedding or portions thereof; a videotape of the defendant's booking; the expert reports of Dr. Robert Swift and Dr. Barry Wall; and the defendant's pre-trial memorandum. Dr. Ingall also interviewed the defendant on October 2, 1999 at the Forensic Unit. He apparently did not review any of the physical evidence introduced at trial, the autopsy report, the cellphone records of the defendant, the medical report of Dr. Lyon, or the notes or testimony of Nurse Catherine Aubin. In addition, he did not listen to any of the trial testimony or review a transcript of the testimony of the defendant or any other witness (with the exception of reviewing Dr. Gleason's trial testimony).
Dr. Ingall never interviewed the defendant again to specifically address the blatant inconsistencies in his statements about his drug ingestion even though he acknowledged that these inconsistencies existed. Dr. Ingall said "he thought about it" but then decided that "no matter what he tells me I'm not going to know what the true story is." He analogized the problem to asking someone who got drunk how many drinks they had that day.
After reviewing the materials indicated, Dr. Ingall could not opine that the defendant's klonopin intoxication was "of such a degree as to completely paralyze his will, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design," as is required by the Vanasse standard to negate specific intent. Indeed, Dr. Ingall was of the view that this standard is not applicable to the world of psychiatric diagnosis or assessment. He indicated that he had never seen any conscious patient, psychotic or not, intoxicated or not, who met the Vanasse standard. The only people he had seen who would meet the standard were unconscious, comatose or catatonic.
While conceding, therefore, that the defendant could not produce enough evidence to meet the standard set by the Rhode Island Supreme Court for establishing a lack of specific intent due to voluntary intoxication, Dr. Ingall went on to opine, in his report, that when the defendant killed Jeanne Robinson on August 18, 1999, he did so without premeditation. In his report, he wrote:
"His anxiety level was extremely high throughout the day, due to the stress of the wedding and the need to meet Jeanne's ex-husband and his family. This anxiety was probably related to his own feelings of inadequacy and possessiveness with regard to Jeanne, her family and her ex-. As noted above, when he has episodes of anxiety, his irritability is high. His attempt to reduce his anxiety with klonopin did not work, and probably served to further disinhibit his actions. His driving on the way back from Newport was impaired. Given the amount of klonopin he took that day, he was certainly intoxicated with drugs. Klonopin is a long-acting benzodiazepine that remains in the blood and urine for days. Throughout the day, although he was tense, anxious and irritable, he had no intent to kill Jeanne Robinson. Although they were arguing in the car, he had no intent at that time to kill Jeanne. When she threw the ring at him and locked herself in her bedroom, he exploded into a rage. It was a crime of passion, in a man with an anxiety disorder, disinhibited by an overdose of klonopin."
Dr. Ingall opined, therefore, that the defendant's attack on Jeanne was impulsive, stemming from disinhibited rage from an overdose of klonopin, and was certainly not premeditated. According to his report, he based his opinion on the following factual assumptions: (1) the defendant had a history of explosive violence while drinking (including hitting his first wife); (2) klonopin disinhibits in a manner similar to alcohol; (3) klonopin was last prescribed for the defendant, and last picked up on August 19, 1999 (which is an error because the last prescription for klonopin was filled on August 13, 1999 and it was the buspar prescription that was filled on August 19, 1999); (4) Dr. Fixman instructed the defendant, in August 1999, to take klonopin only on an as needed basis, he followed those instructions and thus his klonopin level was low on the day before the wedding; (5) on the day of the wedding, the defendant took "many, many" klonopin 0.5 mg tablets and although the exact amount cannot be stated with certainty, he took at least 12 during the day, possibly more; (6) Jeanne told him during the day that he was taking too many pills; (7) a cousin at the wedding with whom he had an angry exchange of words thought he seemed intoxicated; (8) a brother-in-law asked him if he was intoxicated; (9) the defendant told the same story of overusing klonopin during the day to many people, including the police at the bridge, personnel in the emergency room, Dr. Wall at the competency examination and Dr. Ingall; (10) klonopin reaches maximum blood levels 4-6 hours after being swallowed; (11) klonopin is long-acting, and its half-life (the time it takes for half of the amount in the body to be excreted) is 20-40 hours; (12) although the urine screen at Newport Hospital that tests for the presence of klonopin was negative, a screen done the following day at the ACI (should be Forensic Unit) was positive, thereby suggesting that the test result at Newport Hospital was probably erroneous; (13) the defendant was noted to be unsteady on his feet at Newport Hospital, as well as on the videotape at the Newport Police Station shortly thereafter; (14) the videotape of the wedding showed no anger between the defendant and Jeanne and instead showed closeness and affection; (15) Josee Davis felt no need to stay and protect Jeanne after the ride home; and (16) the defendant became suddenly enraged when Jeanne threw the engagement ring at him in the driveway. According to Dr. Ingall, "at this point, disinhibited by klonopin, the defendant acted impulsively, rashly, emotionally, violently and with no malice or premeditation aforethought."
At trial, Dr. Ingall offered additional opinion testimony from that stated in his prior expert reports. He was asked whether he had an opinion, to a reasonable degree of medical certainty, as to whether the defendant was capable at the time of the crime of formulating a conscious intent to murder Jeanne Robinson. He responded "I think that when he killed Jeanne Robinson he was not able to form the conscious intent to kill her and that he did so without premeditation." He testified that he reached that conclusion for essentially the reasons previously outlined in his report. Dr. Ingall opined that "the defendant's cognitive judgment and his behavioral controls were severely impaired by the disinhibition by benzodiazepine [klonopin] and an anxiety disorder." On cross-examination, he testified that the defendant was not suffering from a paralysis of the will but that "he was suffering from a substantial impairment in his capacity to carry out a premeditated and willful act." When asked, therefore, if the defendant's will to withstand evil impulses was impaired, Dr. Ingall indicated that his will was substantially impaired but not taken away. In neither his report nor his trial testimony did Dr. Ingall factor into his analysis the defendant's statements or testimony about his thoughts during the crime or his memory gaps thereafter.
 The Expert Testimony of Dr. Swift
The defendant also presented the testimony of Dr. Robert Swift, an expert in the fields of pharmacology and psychiatry, to support his defense of diminished capacity. Dr. Swift testified based only on a review of the medical records and reports in the case. He also reviewed the expert reports of Dr. Ingall and Dr. Wall and the testimony of certain witnesses. He never met or interviewed the defendant but did review his statements.
In his report, dated October 25, 2000, Dr. Swift opined that the klonopin the defendant was taking may have led to a state of behavioral disinhibition, with the expression of severe anger and impulse violence directed at his girlfriend that lead to her death. He indicated that several factors supported this conclusion.
First, the defendant had a history of suffering from an anxiety disorder, alcohol abuse and general baseline irritability and impulsiveness. This diagnosis was reflected in the psychiatric evaluations by Drs. Fixman, Wall and Brennan and Ingall and the psychological evaluation by Dr. Lyons.
Second, the defendant was intoxicated on klonopin at the time of his girlfriend's death. Dr. Swift determined the defendant was intoxicated at the time of Jeanne's death because he had klonopin available based on a prescription refill on 8/13/99, he took a number of tablets in the hours prior to the killing, and he was observed to be taking the klonopin by friends. He noted that the toxicological screen at the Forensic Unit was positive for klonopin, and the screen at Newport Hospital was negative but probably in error. Using the Forensic Unit test, Dr. Swift extrapolated back to determine the defendant's blood concentration from klonopin at the time of the killing. He assumed, in accordance with the defendant's statements in his interview with Dr. Ingall, that the defendant had been taking at least 2 klonopin tablets daily for at least several days prior to September 18, 1999 and that he then consumed 25 klonopin tablets over several hours during the course of the wedding day. Based on this assumption, Dr. Swift estimated that the defendant had a concentration of klonopin in his blood greater than 50 nanograms/ml at the time of the attack. He said that blood level would have put the defendant in or above the therapeutic intoxication range of 25-75 nanograms/ml and certainly could have led to behavioral disinhibition. Dr. Swift's calculation did not change in his trial testimony even though one of his assumptions changed; he assumed at trial that the defendant's use of klonopin prior to the crime had been sporadic because at trial, the defendant contradicted his earlier statement to Dr. Ingall about regular use (realizing that with regular use he would nbt have had any of his prescribed klonopin left at the time of the crime) by testifying that he took klonopin only as needed and not every day.
Third, the defendant had a history of angry affects and violent behavior triggered by alcohol. Dr. Swift mentioned the specific instances of anger and violent behavior precipitated by alcohol ingestion mentioned in Dr. Fixman's notes of August 18, 1999. In those notes, she wrote that he gets angry easily, kicked in door again "drinking," hit screen again (after 3 drinks), kicked in door once when drunk! In addition, he made reference to the statement by the defendant in Dr. Ingall's report that he struck his first wife once in the head during an argument when he was drinking, became alarmed when she yelled, and took her to the hospital. He had no knowledge of whether the defendant acted violently toward his first wife when he was not drinking but conceded that would have been important in his analysis.
Finally, Dr. Swift said that klonopin acts similar to alcohol and both can cause behavioral disinhibition and violent behavior. He made reference to several articles in the literature that document such behavioral effects from klonopin and indicate that the level of klonopin in the defendant's blood was similar to that in the subjects referenced in the articles. These articles indicate that the primary side effects of klonopin appear to be sedation and ataxia but that in some patients, klonopin can cause behavioral disinhibition. The latter phenomenon is associated with increasing amounts of klonopin and abates once the klonopin is stopped and is out of the bloodstream. As the klonopin level in the blood increases, the level of behavioral disinhibition increases. The failure of patients to respond positively to early doses of klonopin may be a predictor of this drug-emergent adverse effect.
At trial, Dr. Swift was asked whether he could state with a reasonable degree of medical certainty whether the defendant suffered a complete paralysis of his will from klonopin. He said "that is hard for me to say." He opined that the defendant was not consciously able to think about killing Jeanne and did not premeditate and that his cognitive judgment and behavioral controls were severely impaired because of a combination of the klonopin and his anxiety disorder. He referenced the evidence that the defendant cannot control his behavior when intoxicated but he can control himself when not intoxicated.
On cross-examination, however, he had to acknowledge that an anxiety disorder alone would not prevent a person from forming the requisite specific intent. He also acknowledged the question of when the defendant took the klonopin was really important. He admitted that the toxicological test results at the Forensic Unit would be consistent with the defendant taking the klonopin after the crime. In addition, those results probably would not have been achieved with the defendant taking 0.5mgs of klonopin twice a day every day but could have been achieved by taking excess klonopin on the bridge.
Dr. Swift also testified that excess klonopin can cause blackouts or memory problems. He did not opine, however, that the defendant had such memory problems in this case. Indeed, his opinion testimony about behavioral disinhibition relied on the defendant's statements about his klonopin intoxication before the crime, his history of an anxiety disorder and violent behaviors while intoxicated, and evidence of the crime itself. He failed, however, as did Dr. Ingall, to factor into that analysis any of the defendant's thoughts and actions after the crime.
 THE PROSECUTION'S REBUTTAL CASE
To rebut the defendant's case of diminished capacity due to voluntary intoxication, the State presented the expert report and testimony of Dr. Barry Wall, an expert psychiatrist engaged in the private practice of psychiatry and also employed as a forensic psychiatrist at the Eleanor Slater Hospital. The State also presented, in rebuttal, the testimony of the defendant's first wife as to incidents of abuse of her both when he was and was not intoxicated.
 The Expert Testimony of Dr. Wall
Dr. Wall conducted an exhaustive review of all of the documents connected with this case. He reviewed all of the defendant's medical records and reports; expert witness reports; all of the police narratives and witness statements and portions of Grand Jury testimony in the possession of the State; and the videotapes of the wedding and the defendant's booking introduced at trial. He reviewed all of the materials already catalogued by this Court in this decision.
Dr. Wall also conducted an interview of the defendant spanning four hours over the course of three days in mid-November and early December 2000. He detailed the substance of this interview in his report. In the interview, the defendant talked about his personal history. He described his divorce from his first wife as the result of him raising hell due to drinking. He denied ever choking her or hitting her, calling her a "lying son of-a-bitch." He said his second wife divorced him after 18 years simply because she did not want to be married to him anymore. He denied any abuse in that marriage. He talked about his argumentative relationship with Jeanne being born of mutual stubbornness. He said that typically they would holler at each other and then he would leave. He described the worst argument that they had before the crime as being when he kicked in the door one time in 1997. He described his behavior on that occasion as "atypical" and as a result of his having six drinks or so. He said they typically argued about her work, her children and her not taking her medication. He typically made up by sending her flowers or calling her over the phone. The defendant said he and Jeanne became engaged in November 1998 and the wedding date was initially set for May 2000. She broke off the engagement in August 1999, and the defendant professed to not know why. He said that it was not because she was afraid of him. They continued to see each other.
The defendant told Dr. Wall that he drank heavily in his 20's and 30's but that he never drank to the point of sickness or blackouts. He said he had concerns about his drinking in the past but no one else (other than his first wife) ever seemed annoyed by it. He described previous suicidal thoughts, once when he faced financial problems due to his second wife's embezzling from him and another time after an argument with Jeanne that caused them briefly to break up. Both times he thought of jumping off bridges. He also described a history of anxiety and said that he never sought treatment until Jeanne encouraged him to do so. He described the medications that were prescribed, including buspar, and why they did not work. With regard to klonopin, he said that it was a quick fix if he got upset. In the next breath, however, he allowed as how he would just sit in his car if he got upset and that he did not like taking pills or medication. He said he took 0-3 klonopin per day in the days before the wedding. He said that when he first took it, the medication made him feel drowsy but after awhile those symptoms subsided.
As the interview turned to the events of the wedding day, the defendant stated that he had over 60 tablets in his klonopin bottle. He indicated that he took two klonopin pills before he left for the wedding, 3-4 pills after the receiving line, 3-4 pills at some point thereafter when Jeanne was trying to get him to meet her ex-husband's brother and 3-5 klonopin pills after she tried to get him to meet her ex-mother-in-law. He estimated that he had taken a dozen klonopin tablets by that time and felt no effects. He said he took some more pills with 7-Up at the table and 3-4 more pills after someone spilled a drink on Jeanne. He said that at the end of the reception, he backed his car into a tree and began loading lights into the car. Albert Girard, Jr. came by and asked if he had been drinking. On the way home, he said Jeanne hollered at him to turn the wheel as tree branches hit the car. He said he did not know if it was the medication kicking in.
Once back at Jeanne's house, the defendant said Jeanne suddenly threw her engagement ring at him and told him to go home. He surmised that she was aggravated about his not wanting to meet Wayne's family. He got down on his hands and knees and started searching for the ring. He said that he did not know if he went in the house or Jeanne went in the house and handed him the flashlight. He conceded that he might have hollered for her to get the flashlight. The defendant searched for the ring for 10-15 minutes and located it in the basket of decorative lights. He went into the house to get the ring box and then secured the ring in his car. He said since she had thrown the ring at him, he was going to keep it. While he was in the car, he took the remainder of the klonopin in the bottle. He said there were 3-4 left because he had finished the other ones off.
The defendant then related that he went back into the house, went upstairs and found her bedroom door locked for the first time. He pleaded with her to let him in. He said he was upset. When Dr. Wall asked him if he had any plans at that point, he said he did not know what his plan was but that in his right mind, he would never lay a hand on her. He said he put his foot against the door and popped the door open, jumped on top of her on the bed and then put his hands on her throat and started choking her. He does not know if the choking was strong or weak because he had never choked before and he does not know why he stopped choking her. He said he had no thoughts at all.
The defendant next told Dr. Wall that Jeanne was gagging and went downstairs. She said "I loved you, why did you choke me?" He followed her but did not know why — there simply was no reason to be up in the bedroom. They started arguing and the defendant said he hit her with a flashlight because he just saw it. While he hit her with the flashlight he held her with one arm and hit her in the head 3 or 4 times. He did not know why. He was still upset and said he acted out of impulse from anxiety and did not have any thoughts. He said that this incident is when he must have gotten covered with blood.
The defendant said that at that point, Jeanne must have pushed him down and he hit his head against the wall. He said he did not see her because she went out the door. He said he heard her hollering for help so he went outside to help her. He figured she must have been hurt if there was blood. He knew there was something wrong so he went out and put his, arms around her. He did not know what was happening. He was probably going to take her back in the house.
After he put his arms around Jeanne, the defendant said he could not recall his location relative to the car. He stated that he did not know how she got to wherever she was behind the car, on the side of the car. He said the next thing he recalled was trying to back the car down the driveway. He said "I just wanted to get out of there." He claimed he did not know why, his mind was just racing. He said his car went backwards and then stopped and would not move. He put the car in forward and then in reverse again and proceeded to back down the street. He said he heard a funny noise and thought it was a mud flap. He was aware he was covered in blood so he threw his shirt away on the Bain track and put on his sweatshirt. He just wanted to get the blood off of him and thought something must be really wrong with Jeanne because of all that blood. He said he figured something awful happened.
The next thing the defendant recalled was seeing a sign for the Newport Bridge. He recalled calling one of his sisters and telling her that he thought that something bad had happened to Jeanne and that he must have killed her with all the blood he had on him. He said he picked up the phone because he just wanted for some reason to tell his sister. He wanted to end his life so he could be with Jeanne.
When he got to the Newport Bridge, he threw some tokens into the basket and went to the top of the bridge. He either crawled or walked to an outside catwalk. He could see police officers coming and he saw Frank Rosa, a Newport police officer he had known for twenty years. He told Officer Rosa not to come after him because he did not want to take him over the rail with him to his death. He recalled the officers informing him that they could not tell him anything about Jeanne's condition until he came off the bridge. The last thing he recalled was being pulled over the bridge. He next recalled an IV in his arm at Newport Hospital. He did not recall being taken to any police stations. He next recalled trying to commit suicide at the ACI.
The defendant told Dr. Wall that he never intended to hurt Jeanne at any moment. He said he choked her on impulse. He said he would not hurt her. He did not plan to kill her, he said, "I would have walked away from our relationship. She was the best thing that ever happened to me."
Based on the defendant's version of the events (including taking an excessive amount of klonopin before the crime; thinking nothing while he was choking Jeanne, hitting her with a flashlight, putting his arms around her in the driveway or driving away; and recalling little about the crime in the hours thereafter), Dr. Wall opined that it was possible that his level of intoxication could have completely paralyzed his will, taken from him the power to withstand evil impulses or rendered his mind incapable of forming any same design. Dr. Wall thought that the following factors, however, would not support an opinion that the defendant could not have formed the specific intent to kill: (1) the defendant's ability to exert willful behavior by first taking care of the ring; (2) his ability to engage in a complicated series of behaviors toward Jeanne from choking to beating to helping her outside, reflective of determination, will and the ability to control one's actions; (3) his awareness of the wrongfulness of his conduct by knowing something was wrong from the blood after beating her and again as he left the scene; and (4) the inconsistencies in the evidence indicative of the defendant taking less klonopin than he said he took.
Dr. Wall next opined that if the State's version of the crime is accepted, based on evidence from the police and others witnesses, then the defendant's level of intoxication would not have completely paralyzed his will, taken from him the power to withstand evil impulses or rendered his mind incapable of forming any sane design. This evidence would indicate that the defendant was not having blackouts because he was talking on the Newport Bridge about events that happened 30 minutes earlier. It would suggest further that the defendant was able to plan his actions despite intoxication by moving from choking to beating to running Jeanne over and by planning his actions on the bridge. The evidence of the defendant tearing off his shirt and phoning his sisters would indicate an awareness that what he did was wrong. His statements after the fact to others would be reflective of an awareness of his criminal behavior and knowledge about its wrongfulness.
At trial, Dr. Wall testified that he diagnosed the defendant as having a generalized anxiety disorder (i.e., an anxiety condition that affected his life) and a personality disorder of a chronic maladaptive personality style. This personality style had attributes of frantic efforts to avoid abandonment, unstable and intense interpersonal relationships, emotional instability, inappropriate and intense anger and rigidity and stubbornness. Dr. Wall testified that he focused on the defendant's state of mind, as reflected in the evidence, as opposed to his level of klonopin intoxication since the evidence about that level was so much in conflict. He assumed that the defendant was intoxicated to some degree in both of his scenarios and acknowledged that klonopin can cause florid intoxication (like a bull in a china shop or a person falling down drunk), blackouts or fragmentary memory loss or, more commonly, ataxia and sleepiness. He acknowledged that it was possible that the defendant became intoxicated after the crime. He used the Vanasse standard in opining on the subject of diminished capacity but his testimony really focused on the question of whether the defendant, as a result of klonopin intoxication, lacked the ability to act purposefully, with an intent to kill as a conscious objective, and with knowledge or awareness of what made that conduct wrong at the time.
 The Testimony of the Defendant's First Wife
The prosecution, over the defendant's objection, sought to introduce the testimony of the defendant's first wife, Susanne Murray, as to his abusive conduct toward her during their marriage both while he was intoxicated and not intoxicated. The Court denied the defendant's motion in limine to exclude this testimony under Rule 404(b). The Court reasoned that the evidence would not be admissible to show the defendant's propensity to commit the charged crime but was probative on the issue of the defendant's state of mind, intent and capacity to form the requisite intent. See State's Memorandum of Law on Admissibility of Prior Violent Acts on Issues of Intent and Impeachment and cases collected therein. The defense, in this Court's judgment, essentially conceded the probative value of the evidence by using evidence, with no objection by the State, of the defendant's violence toward his first wife while drinking as part of the foundation for its expert witnesses' testimony that the defendant was behaviorally disinhibited from klonopin at the time of the crime. The experts reasoned that because klonopin acts like alcohol, the defendant's abuse of his first wife after drinking is probative of him being intoxicated on klonopin at the time he abused Jeanne and of his absence of specific intent. The State sought to introduce evidence of his abuse of his first wife while not intoxicated to rebut the defendant's theory. The Court also noted that any concerns about the remoteness of this evidence went to its weight and that there would be no danger of the prejudicial use of the evidence to show propensity in a bench trial. In addition, the Court found that this evidence was admissible to impeach the defendant's characterizations of his relationship with his first wife and the testimony of the defendant's experts as to the defendant's history of violence while drinking that did not account for possible episodes of violence when not drinking. See State v. D'Alo, 435 A.2d 317, 320 (R.I. 1981).
Susanne Murray testified to an incident on their wedding day when the defendant, after only a few drinks, got intensely angry at her and drove erratically when she told him she had forgotten her house key. She testified as to another incident, that caused her to move back with her parents the first time, where the defendant did not like a meal she had made. He flung a plate against the wall, was verbally irate and shoved and slapped her. She said he was not drinking that day.
Susanne Murray next testified as to another violent episode when the defendant had not been drinking. He was intensely angry because her carpool ride was late and he had to wait for her. After he picked her up, he peeled out of the driveway and hit her with his fist and arm in her chest. This incident prompted her to move back home for the second time. She said that the defendant frequently hit her when he was not drinking. If she cried, that would make him more angry because he was afraid people would hear.
Finally, she testified as to the incident that made her leave the defendant after less than a year of marriage. The defendant was very drunk and got jealous when a man she knew came over to their table at a restaurant to congratulate her on her marriage. The defendant swore at her, calling her a son-of-a-bitch, and made her leave. On the ride home, he insisted on driving even though he was very drunk. She asked him to let her drive or let her out. He refused and sped off. She opened the car door to get out and he grabbed her by the hair and pulled her back inside the car. He swore at her and punched her in the face before she managed to get the door open. He slammed her wrist in the door, pulled over and choked her until she could not breathe. She went limp and pretended to be dead because she thought he would kill her. He kept trying to wake her up. He then said, "Oh my God I've killed her, now what am I going to do with the body?" He drove to the top of the Mt. Hope Bridge, at which point she opened her eyes. He was relieved she was okay and told her he would take care of her. He drove her to the hospital and said that he did not mean to hurt her and that he loved her so much. She filed for divorce but he still pursued her. She warned his second wife about the defendant's drinking problem and violence while drinking, but did not talk about his violence when sober. Her testimony was credible and riveting.
 THE LAW OF FIRST DEGREE MURDER, SECOND DEGREE MURDER AND DIMINISHED CAPACITY
Under § 11-23-1 of the Rhode Island General Laws, murder is defined as "the unlawful killing of a human being with malice aforethought." The statute provides that any kind of "willful, deliberate, malicious and premeditated killing," as well as those falling within the expressed parameters of the felony murder rule, is murder in the first degree. G.L. 1956 § 11-23-1. Any other murder is murder in the second degree. G.L. 1956 § 11-23-1(c).
To prove a defendant guilty of the crime of first-degree or second-degree murder, the State must prove beyond a reasonable doubt that the defendant killed another human being with express or implied malice aforethought. State v. Mattatall, 603 A.2d 1098, 1105 (R.I. 1992), cert.den., 506 U.S. 838, 113 S.Ct. 117, 121 L.Ed.2d 74 (1992); State v.McGranahan, 415 A.2d 1298, 1302 (R.I. 1980); State v. Fenik, 45 R.I. 309, 314, 121 A. 218, 221 (1923). "Legal malice can arise from either an express intent to kill or to inflict great bodily harm or from hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty." State v. Lambert,
705 A.2d 957, 964 (R.I. 1998) (quoting McGranahan, 415 A.2d at 1302). Malice aforethought "consists of an "unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life."' State v. Parkhurst, 706 A.2d 412, 421 (R.I. 1998) (quoting McGranahan, 415 A.2d at 1302). "[A]lthough both second-degree and first-degree murder require the element of malice aforethought, first-degree murder also requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not." State v. Grabowski, 644 A.2d 1282, 1285 (R.I. 1994).
To prove murder in the first-degree, the State must prove that the defendant intended to kill the victim and that the intent to kill was accompanied by premeditation and deliberation. Grabowski, 644 A.2d at 1285; Mattatall, 603 A.2d at 1106 (citing 2 Wharton's Criminal Law,
§ 140 at 182, 184-85 (Torcia 14th ed. 1979)); Fenik, 45 R.I. 309, 315, 121 A. 218, 221 (1923). "Deliberation" requires a mind that is capable of reflection, and "premeditation" requires that the mind did in fact reflect. . . ." State v. Diaz, 654 A.2d 1195, 1201 (R.I. 1995) (quoting LaFave Scott, Criminal Law § 7.7(a) at 643 2d 2d. 1986)). Murder in the first-degree requires the State to prove beyond a reasonable doubt a premeditated intent to kill of more than a momentary duration in the mind of the accused. Parkhurst, 706 A.2d at 421 (citing Grabowski, 644 A.2d at 1285); see also Fenik, 45 R.I. at 315, 121 A. at 221 (1923) (premeditation necessary to establish first-degree murder must be shown "to have existed for more than a barely appreciable length of time before the killing"); State v. Vorgvongsa, 692 A.2d 1194, 1196 (R.I. 1997) ("Such premeditation has been defined as requiring the formation of an intent to kill for a period more than momentarily prior to the killing itself.")(citing State v. Amazeen, 526 A.2d 1268, 1271 (R.I. 1987)).
In contrast, if the formation of intent to kill is of momentary duration, Graboswki, 644 A.2d at 1285 and Fenik, 45 R.I. at 315, 121 A. at 221, or exists in the mind of the accused for only a very brief time before the killing, State v. Iovino, 554 A.2d 1037, 1039 (RI. 1989), the offense is murder in the second degree.[1] Parkhurst, 706 A.2d seealso Mattatall, 603 A.2d at 1106 ("If there is a formation of an intent to kill, however brief, it can satisfy' the necessary element to establish malicious intent."). "[S]econd-degree murder is a lesser-included offense of first-degree murder." Grabowski, 644 A.2d at 1286 (citing State v. Casasanta, 29 R.I. 587, 598, 73 A. 312, 317 (1909)). "[I]f the State proceeds on a theory of an intent to kill and the duration of the intent is questionable, an instruction on both first-degree and second-degree murder should be given." Parkhurst, 706 A.2d at 421 (citing Fenik, 45 R.I. at 315, 121 A. at 221). "However, an instruction on a lesser offense is not necessary 'when such a charge is wholly unsupported by the evidence.'" State v. Brown, 744 A.2d 831, 838 (R.I. 2000) (quoting State v. Figueras, 644 A.2d 291, 294 (R.I. 1994)).
If an accused cannot form the intent to kill because of diminished capacity, a charge of murder may be reduced to voluntary manslaughter. The diminished-capacity doctrine
 "recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him [or her] of all criminal responsibility, his [or her] mental capacity may have been diminished by intoxication, trauma, or mental disease so that he [or she] did not possess the specific mental state or intent essential to the particular offense charged."
State v. Correra, 430 A.2d 1251, 1253 (R.I. 1981). "[I]n murder prosecutions in which it is alleged that the defendant had the specific intent to kill, a successful diminished capacity defense enables the [factfinder] to find the defendant guilty of the lesser included, diminished-capacity form of voluntary manslaughter. State v. Amazeen, 526 A.2d 1268, 1272 (R.I. 1987). "It does not allow the defendant to be found `not guilty' of his or her homicidal act." Id.
Voluntary manslaughter is the "product of a deliberate act that does not include the element of malice aforethought by reason of one or more mitigating factors such as diminished capacity." State v. Hockenhull,525 A.2d 926, 929 (R.I. 1987). "Before a trial justice is required to give an instruction on manslaughter by reason of diminished capacity the evidence, however minimal, must permit a reasonable [factfinder] to find that the defendant, due to his or her diminished capacity, was incapable of forming a specific intent upon which malice could be predicated."Amazeen, 526 A.2d at 1272. Such diminished capacity may result from voluntary intoxication. Hockenhull, 525 A.2d at 930. However, intoxication may be offered to negate the intent required as an element of murder only "if it is "of such a degree as to completely paralyze the will of the [defendant], take from him [or her] the power to withstand evil impulses and render his [or her] mind incapable of forming any sane design.'" State v. Sanden, 626 A.2d 194, 199 (R.I. 1993) (quoting Statev. Vanasse, 42 R.I. 278, 281, 107 A. 85, 86 (1919); also citing State v. Doyon. 416 A.2d 130, 134 (R.I. 1980); State v. McGehearty, 121 R.I. 55, 59-60, 394 A.2d 1348, 1351 (1978); State v. Turley, 113 R.I. 104, 112,318 A.2d 455, 459 (1974)). Once the defendant presents evidence of his or her voluntary intoxication, "then the state is required to prove beyond a reasonable doubt that the defendant was not so intoxicated as to be unable to harbor the requisite specific intent." Sanden, 626 A.2d at 199 (citing McGehearty, 121 R.I. at 60, 394 A.2d at 1351). If a defendant fails to present sufficient evidence "to establish the extent of his drunkenness was such as to negate the intent required as an element of the crime of murder, namely malice aforethought or evil intent," the trial justice need not charge the jury on the state's burden. Id. In murder cases involving a diminished capacity defense based on voluntary intoxication,
 "a trial justice must give a manslaughter by reason of diminished capacity instruction only if the evidence would permit a reasonable jury to find that the defendant's intoxication so completely paralyzed his or her will that it took from him or her the power to withstand evil impulses and the capacity to form any sane design or intent to kill."
Amazeen, 526 A.2d at 1272.
 ANALYSIS OF LEGAL ISSUES The Defendant's Motion to Suppress
As a threshold matter, this Court must determine whether the statements that the defendant made to Detective Rosa and Trooper Liu on the bridge and the statements he made to Detective Falcone while in custody thereafter should be suppressed. The defendant argues for suppression on the grounds that the officers engaged in the impermissible questioning of the defendant while he was in custody and after they knew he was a murder suspect without first properly affording him his Miranda warnings.
The Rhode Island Supreme Court has previously held that "the Miranda
doctrine is not applicable to spontaneous statements but is triggered only by the dual presence of custody and interrogation." State v.Walker, 667 A.2d 1242, 1248 (R.I. 1995). Absent a formal arrest, the determination of whether a person is subjected to restraints comparable to those associated with a formal arrest turns on how a reasonable person in the suspect's position would understand the situation. State v.Caruolo, 524 A.2d 575 (R.I. 1987) (citing Berkemer v. McCarty,468 U.S. 420, 422 (1984)). The question of custody, therefore, requires consideration of whether, in view of all of the circumstances, a reasonable person would believe that he or she is not free to leave.State v. Diaz, 654 A.2d 1195, 1204 (R.I. 1995). In making this determination, a court may consider the following factors: "(1) the extent to which a person's freedom is curtailed; (2) the degree of force employed' by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether or not the person had the option of accompanying the police." Diaz 654 A.2d at 1204. Further, a non-custodial setting is not converted to a custodial one simply because the defendant may be a suspect. Diaz, 654 A.2d at 1205 (citing Oregon v.Mathiason, 429 U.S. 492, 495 (1977).
In this case, the defendant voluntarily placed himself out on a girder of the Newport Bridge and behind a locked gate leading to the travel portion of the bridge. He was there before the police arrived. When the police initially approached the defendant, he ordered them to stand back and threatened to jump if they came any closer. The police initially complied and then Detective Rosa, at first, and Trooper Liu, sometime later, attempted to move closer to establish better rapport with the defendant in an effort to keep him on the bridge. The police officers did not order the defendant to get off the bridge or attempt to coerce him into their arms; they were trying simply to get the defendant to make his own decision to come to safety out of primary concern for his well-being. Although the presence of the police on the bridge may have restricted the defendant's freedom of movement and although the officers would have tried to prevent him from flight if he moved off the eye-beam and onto the bridge itself, it cannot be said that a reasonable person innocent of a crime would have believed he or she was under arrest at that time. See People of the State of New York v. Spina, 713 N.Y.S.2d 394
(2000) (court held that defendant standing at the brink of Niagara Falls and threatening suicide with police around him was not in custody for purposes of Miranda). Even assuming that the police officers viewed the defendant as a murder suspect, that fact, without more, would not convert the non-custodial setting of the bridge into a custodial setting.
Moreover, the statements that the defendant made to Detective Rosa and Trooper Liu on the Newport Bridge were spontaneous statements that were not the result of police questioning. These officers were engaged in a continuous conversation with the defendant, given his suicidal state, to try to ensure that he would not jump off the bridge. In the course of those discussions, the defendant made many damaging admissions as he vented about his killing of Jeanne Robinson that were not in response to police questioning. Those discussions hardly could be characterized as a form of police interrogation.
As a result, the State has satisfied this Court with clear and convincing evidence that the defendant was not in custody while he was out on the Newport Bridge and that neither Detective Rosa nor Trooper Liu interrogated him at that time. Thus, those officers were not required to give the defendant his Miranda warnings atop the bridge. Indeed, one could argue that it would have put the defendant at greater risk for suicide had they done so. The defendant's motion to suppress the statements that he gave to Detective Rosa and Trooper Liu on the Newport Bridge is denied.
The statements the defendant gave to Detective Falcone, however, stand on a slightly different footing. At that time, the defendant clearly was in police custody and subject to police interrogation. While the defendant was at various points afforded his Miranda rights, the evidence fails to satisfy this Court to the requisite degree of clarity that the defendant, given his state of intoxication at that time, understood his rights and intelligently and voluntarily relinquished them prior to speaking with Detective Falcone. The defendant's motion to suppress is thus granted as to the statements he made to Detective Falcone While he was in custody and subject to interrogation by him.
 The Defendant's Motion to Dismiss
The Court next must consider the motion of the defendant to dismiss the charge against him of murder in the first degree which he made at the close of the prosecution's case-in-chief. He contends that the State failed to present sufficient evidence of malice aforethought to prove the charge of first degree murder beyond a reasonable doubt.
It is well-established that "in jury-waived trials in this state, the appropriate motion by which a defendant may challenge the legal sufficiency of the state's trial evidence at the close of the state's case is by a motion to dismiss." State v. Pineda, 712 A.2d 858, 861 (R.I. 2000) (quoting State v. McKone, 673 A.2d 1068, 1072 (R.I. 1996)). In a case tried without a jury, a "trial justice, in ruling upon that motion, acts as a factfinder." Id. at 862 (quoting McKone, 673 A.2d at 1072-73). In that role, the trial judge is required to weigh and evaluate the evidence, pass upon the credibility of the witnesses and make inferences impartially without viewing them in favor of the nonmoving party. After so doing, if the trial justice in a criminal setting concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she must deny the motion to dismiss. Id.
In considering this motion to dismiss, this Court accepts as its findings of fact all of the facts set forth above in the factual background portion of this decision with respect to the prosecution's case-in-chief. Based on this evidence, the State clearly has presented sufficient evidence in its case-in-chief to prove, beyond a reasonable doubt, that the defendant killed Jeanne Robinson willfully, deliberately, maliciously and with premeditation.
The defendant and Jeanne had been building toward this fatal juncture for weeks. Their relationship almost ended a month earlier when Jeanne tried to break up with Brad over his violence and deception. Things were really bad; Jeanne ominously warned her sister that if anything happened to her, Brad did it. As bad as it was, however, Jeanne simply tried to keep loving and tried to get him help. She was a good person. She continued to see him, hopeful that she could maintain the status quo until after her daughter's wedding, and that someday things would be better.
At the same time, Brad grew increasingly agitated about the wedding. It involved children that weren't his own, expenses he didn't need, and the family of Jeanne's ex-husband for whom he had no use. It promised to be one of the brightest days in Jeanne's life, which had with nothing to do with him. That made him angry. He did not want to share her with all of those people. He did not want her to share a joy that he couldn't feel.
On the day of the wedding, Brad could not let Jeanne have her special day. He criticized her hair, yelled at her about not taking her medication and threatened to stay home. When push came to shove, however, the thought of her having a great time without him trumped his disgust at having to go. Brad finally went to the wedding, but he did all he could to rain on her parade. He left Jeanne alone to mingle. He balked at being photographed with her ex-husband's family. He got angry when she spilled a drink on the dress that had cost him hundreds of his precious dollars. He refused her repeated requests to meet her ex-husband's family.
Meanwhile, Jeanne was reaching her limit. He was ruining her night. She wanted so much for him to socialize with her ex-husband's family and explore doing business with her former brother-in-law. They were a special part of her life. She wanted to share that with Brad. Brad kept saying no. She confided in her sister that she had finally had it. Surrounded by the warmth of family and friends, she gained perspective and courage.
Jeanne and Brad left the wedding. Brad thought he had won. He left without ever caving to Jeanne's plea that he meet her former family. What he didn't know was that Jeanne had made her decision. She asked him to go home. She gave him back the ring. And she ended their relationship once and for all.
Brad had not won. He had lost. He had given away the gold.
He knew it was over, but he could not accept it. If he could only make her understand his feelings about her former family. He had to have the last word. He secured the ring. After all, with Jeanne leaving him, it was all he had left of value. It was his ring. He had paid thousands of dollars for it and was still in debt. She had to understand. She had to change her mind.
But Jeanne stood her ground. She would not talk. She would not change her mind. She cowered behind the locked door to her bedroom. Brad would make her understand. He could win. He burst through the locked bedroom door and strangled her. When that did not shut her up, he followed her downstairs and beat her over the head multiple times with the flashlight. When she still wouldn't shut up, he dragged her outside. Alma Miller heard Jeanne's last cries for help. Then Brad silenced her. He put her behind the wheels of his car and hesitated, considering his final act for 15-20 seconds. He then got behind the wheel of the car and ran over her as he backed rapidly down the driveway. His car dragged her body into the street where he left her, lifeless like a rag doll, without ever turning back.
He had won, or so he thought. He had the last word. But with her gone, he had nothing left to lose. He headed for the Newport Bridge to jump. He called his sisters and admitted his acts of murder. He perched himself on an outer beam of the bridge. The police arrived and he admitted his crimes to them. He kept hoping, somehow, that he had not done what he knew he had done. He killed the very person who meant the most to him because she was too good. He had no choice; dead or alive, she was gone.
Brad's deliberate and premeditated intent to kill Jeanne Robinson is evident in his sustained and prolonged series of assaults on Jeanne that became progressively severe. He did not stop after choking Jeanne. He did not stop after beating Jeanne over the head multiple times with a flashlight. He did not stop until he had silenced her and run her over with his car. He did not stop until she was dead.
His deliberate and premeditated intent to kill also is demonstrated in the defendant's actions outside his car. As he stands there in the cool of the night, we know that Jeanne has been strangled and beaten. We know that she has been silenced, as her cries for help are heard no more. Yet Brad pauses next to his car door, hesitating, before taking that final step that will turn his vicious assaults to murder. After thought and reflection for at least 15-20 seconds, uninterrupted by any argument or cries from Jeanne, the defendant quells any last minute doubts about his decision. He then gets in the car and runs her over. He silences Jeanne forever.
All of his actions, including his prolonged assaults increasing in severity until the killing was completed and his reflection outside the car door before running her down, demonstrate "adequate time ... to develop a conscious design and intent to kill." State v. Smith,121 R.I. 495; 401 A.2d 41 (1979). All of these acts demonstrate a vicious murder done in a manner that "demonstrated more than momentary resolve."State v. Brown 744 A.2d 831 (R.I. 2000) (affirming conviction for first degree murder where death resulted from a "sustained attack" over a "prolonged period"). Accordingly, the evidence presented by the State in its case-in-chief is more than sufficient to establish, beyond a reasonable doubt, that the defendant killed Jeanne Robinson with premeditation, deliberation and malice aforethought so as to constitute murder in the first degree. The defendant's motion to dismiss, therefore, is denied.
 The Defense of Diminished Capacity
It is clear from the evidence presented in the defense case that the defendant has failed to produce sufficient evidence, under the Vanasse
standard, to support a defense of diminished capacity due to voluntary intoxication. Even crediting the defendant's testimony as to the level and timing of his klonopin ingestion and his thoughts and actions during and after commission of the crime, neither Dr. Ingall nor Dr. Swift could opine that the defendant's intoxication from klonopin was "of such a degree as to completely paralyze the will of the defendant, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design." At most, they could state that his intoxication substantially impaired, but did not remove, his cognitive judgment and behavioral controls and his ability to act willfully and to withstand evil impulses. Their inability to give the requisite expert opinion testimony, however, is not because the Vanasse test can never be met, as the defense suggests. Indeed, Dr. Wall suggests that it could possibly be met in this very case if this Court were to credit the defendant's testimony as to his level of and timing of klonopin intoxication and his absence of thoughts and memory loss thereafter. Their inability to opine that the defendant's intoxication met the Vanasse standard suffers instead from a more fundamental flaw — the fact that the level and timing of the defendant's ingestion of klonopin and his actions and inaction during and after the commission of the crime, even if believed, are simply insufficient to negate specific intent under Rhode Island law. The most these experts can say is that the defendant's cognitive judgment and behavioral controls were substantially impaired — a level of impairment that is clearly below the Vanasse standard.
Moreover, even assuming that the failure of the defense experts to opine that the defendant's level of klonopin intoxication met the Vanasse
standard is not dispositive of the defense of diminished capacity, the defense suffers from other fatal flaws. Neither of the defense experts is able to indicate with any certainty whether the defendant in fact ingested klonopin prior to the killing and the amount of any such ingestion. While the experts agree that the defendant must have ingested enough klonopin at some point to become intoxicated, as evidenced by the toxicology screen at Slater Hospital, they cannot opine with any certainty as to the amount or timing of that ingestion. Dr. Swift said that from a pharmacological perspective, he could not say whether the klonopin was taken before or after the crime. Dr. Ingall stated "On the day of the wedding, I don't know how many klonopin he took. I don't think anybody knows exactly. I don't think he knows."
Yet the entire defense case of diminished capacity is premised on the assumption that the defendant was intoxicated on klonopin before the crime to a degree that substantially impaired his cognitive and volitional abilities. There is no scientific analysis, however, that can help answer the inquiry of whether that ingestion occurred before or after the crime. The defendant's statements about the amount of klonopin he took and when he took it are fraught with critical inconsistencies that were acknowledged by all experts. His experts acknowledged never questioning him about these inconsistencies or making any attempt to reconcile them. They further acknowledged that, given these inconsistencies, the evidence regarding the amount and timing of the defendant's klonopin ingestion is speculative. The other corroborative evidence advanced by the defendant in support of his defense, even if accepted, cannot cure this fundamental deficiency in the evidence in support of the defendant's case. As that evidence is legally insufficient to support a defense of diminished capacity, the defendant fails, for these reasons as well, to meet his preliminary burden of showing intoxication under Vanasse.
This inability of the defense to meet its burden of production under the Vanasse standard is reflective of the policy underpinnings of the law of diminished capacity in Rhode Island. The Vanasse standard ensures that a defendant who kills will not be able to use self-serving statements about the amount and timing of his voluntary ingestion of intoxicants to defeat a charge of murder and lessen his conviction to one of manslaughter unless he can produce sufficient corroborating evidence that his level of intoxication at the time of the crime was sufficiently high that he lacked the capacity to form the requisite specific intent. The standard, in essence, is a qualitative control on the evidence submitted by the defense in the first instance to ensure that the State is not left with an impossible burden to meet in negating a defense premised on voluntary intoxication.
As the defendant is unable to meet his burden of producing evidence that he was intoxicated at the time of the crime "to such a degree as to completely paralyze his will, take from him the power to withstand evil impulses and render his mind incapable of forming a sane design", he fails to make the preliminary showing of intoxication sufficient to impose on the state the burden of showing beyond a reasonable doubt that defendant was not so intoxicated as to prevent his having formed the requisite specific intent.
Moreover, it is clear from the testimony of the experts that the fulcrum for their opinions is the defendant's self-serving statements about the amount of klonopin he took and when he took it. Dr. Ingall assumed that he took at least 12 klonopin prior to the killing. Dr. Swift based his pharmacological calculations on the assumption that the defendant took 25 klonopin over several hours on the day of the wedding. While the defense experts relied on other evidence to corroborate the level and timing of klonopin ingestion testified to by the defendant and their opinions regarding behavioral disinhibition, it is clear that their opinions are without foundation unless the Court accepts as credible the defendant's testimony that he took a substantial amount of klonopin in the many hours before the killing. In addition, Dr. Wall opined that the only way it is theoretically possible that the defendant lacked specific intent is if the Court were to accept his testimony as to his level and timing of klonopin ingestion and his lack of thoughts and memory as to the events of the crime and thereafter. If the defense of diminished capacity asserted by the defendant does not fail for the reasons previously indicated, therefore, it must rise or fall on the credibility and weight of the defendant's testimony.
The defendant asks this Court to believe that he ingested large amounts of klonopin during the day of the wedding such that, at the time of the crime, he was highly intoxicated, behaviorally disinhibited and did not intend to kill Jeanne Robinson with premeditation. He asks this Court to believe that he recalls strangling her and beating her with a flashlight, but that he had no thoughts at the time and little or no memory of the events thereafter. His "story" of klonopin intoxication before the crime, lack of thoughts during the crime and lack of memory after the crime simply lacks credibility.
At trial, the defendant testified in excruciating, painful detail as to his memory of hurting Jeanne on the night in question. He displayed a flat affect and spoke in a monotone voice, without emotion. He recounted that she threw the ring at him, he searched for it with a flashlight, he found it, he got the ring box from the house and secured the ring in his car, he went back into the house to tell Jeanne that she was wrong for wanting him to meet her ex-husband's family, he broke into her bedroom and strangled her, he followed her downstairs where he beat her multiple times with a flashlight, he followed her outside where she hollered (quietly) for help, and he put his arms around her.
This essential story has remained consistent in its retelling. The defendant admitted to his sister right after the crime that he hit Jeanne with a flashlight and that the ring was in the car. He told Detective Rosa on the bridge that he kicked in the bedroom door and beat her. He told Trooper Liu about the ring in the car. He admitted to Nurse Aubin that he choked her and hit her in the head with a flashlight. He told Dr. Gleason that he had gotten into an argument with his fiancee, she had thrown the ring away, he had tried to get into the house or apartment, he had knocked down the door and then he had strangled her. He told Dr. Ingall that Jeanne threw her engagement ring at him, he looked for the ring with a flashlight, he found the ring, he went into the house to retrieve the ring box and then secured the ring in his car, he went back into the house and forced Jeanne's bedroom door open, he strangled her, he followed her downstairs and hit her 3-4 times with a flashlight, he followed her outside and then he put his arms around her. The defendant also told Dr. Wall a similar story.
The defendant has not been consistent, however, as to his statements regarding his state of mind during the brutal acts inside the house or his memory of what he thought and did after he held Jeanne in his arms outside the house. At trial, he testified that he had no thoughts while he strangled and beat Jeanne inside the house. As to the events outside the house, he testified that after she hollered "help me, help me" and he put his arms around her, he did not know where he put his arms and he could not say if he put her on the ground. He denied shutting her up and said he did not know what happened. He related getting into his car but not knowing where she was in relation to it. He said he started backing out of the driveway, the car stopped, he pulled forward and then he backed up again out of the driveway and down the street. He said he heard a mud flap or something dragging but did not stop to check his car. He said he noticed at that point that his shirt was bloody and, not liking the sight of blood, he said he stopped at the Bain track and tore it off, threw it on the track and put on a sweatshirt. He said he recalled nothing else until he saw a sign for the Newport Bridge. He recalled putting his tokens in the basket but did not recall stopping on the bridge or getting onto the outer I-beam. He recalled seeing, only Detective Rosa on the bridge and no one else and did not recall speaking to him. He said the next thing he recalled was waking up with an IV in his arm. He did not recall where he was at that time or speaking with anyone. He next recalled being at the ACI but had no recollection of the police stations in between the hospital and the ACI.
From this testimony, the defendant wants this Court to believe that he had no thoughts while he was hurting Jeanne, he has no memory of whether or how he killed her and he has limited, fragmentary memory of most of what happened in the minutes and hours after he ran over her body. He wants this Court to believe that his klonopin intoxication caused these gaps in his thoughts and memory. His testimony as to the absence of thoughts or memory, however, is flatly at odds with the evidence as to his statements and actions in the minutes and hours immediately following the crime.
Right after Jeanne was silenced, according to the credible testimony of Alma Miller, the defendant hesitated 15-20 seconds before getting into his car. He did not put his car into reverse and then forward and then reverse again, as he testified. He sped down the driveway in reverse, bouncing and bucking as he rolled over Jeanne's body at least twice. As he proceeded down Fiat Road, he did not stop to see what was the matter and then discover a bent mud flap, as he told Dr. Ingall. Indeed his testimony about a mud flap as the explanation for his car trouble is ludicrous in light of Alma Miller's testimony about the motion of the car. He sped down Fiat Road without ever stopping or looking back. Within minutes of the crime, he called his sister Debbi and said "I think I'm in trouble. I've killed Jeanne." He told her that he had hit Jeanne and run her head over twice. He said the ring was in the glove box. About 15 minutes later, he called his sister Cindy and told her that he had killed Jeanne and was on the way to the bridge to jump. Just prior to these calls, the defendant had stopped at the Bain track to quickly rip off his tuxedo shirt, dispose of it and put on his sweatshirt.
The defendant continued to the Newport Bridge and got onto the bridge without attracting any undue attention at the toll booth. He drove to the top of the bridge, pulled his car over to the side and put on his flashers, and crawled out onto a steel eye beam, perched precariously hundreds of feet above the sea. He recognized Detective Rosa as a friend when he approached. He told his friend that he had done something that he could not live with. He said "I killed her. I killed her." He was traumatized about the prospect of going to jail or to the "loony house." He told Rosa not only that he strangled her and beat her but that he slammed her head into the driveway and ran her over with his car twice. He said he dragged her outside and ran her over to kill her.
Once at the Newport Hospital, the defendant made one of his most revealing statements to Nurse Catherine Aubin. She, like Jeanne, was a supervising nurse; she may have seemed to him, in his growing intoxicated state, like Jeanne incarnate. He told her "I had an argument with Jeanne. I choked her. When she wouldn't shut up, I hit her over the head with a flashlight. When she still wouldn't shut up, I dragged her outside and ran her over with my car." He said those haunting words to her in a similar monotone voice and with a similar flat affect to that exhibited by him while testifying before this Court at trial, albeit with thicker speech more indicative of intoxication.
The testimony of Nurse Aubin, Detective Rosa and the defendant's sisters as to the defendant's statements in the minutes and hours immediately following his killing of Jeanne Robinson were very credible. They flatly contradicted his trial testimony that he had no thoughts while he was hurting Jeanne, no ability to plan his behavior, and no recollection of what happened after Jeanne was in his arms. They show that he intended to kill Jeanne and that he knew not only that he killed Jeanne but how he killed her.
Aware that the statements to his sisters, Detective Rosa and Nurse Aubin could eviscerate his defense, the defendant testified at trial that he has no memory of these statements today. Even that testimony about lack of memory, however, is inconsistent with his prior statements. While he testified at trial that he has no memory of the calls to his sisters, he told Drs. Brennan and Wall at his competency evaluation a few days after the crime that he called his sisters and that he told one of his sisters that he was going to jump off the bridge. He also told Dr. Ingall about a call to one sister, suggesting that she rather than he then called his other sister. In speaking with Dr. Ingall, he tried to characterize the call to his sister as one where he said he thought he killed Jeanne and that he figured something bad had happened to her (implying that he had no memory of what happened to her). The testimony of both sisters at trial, however, contradicts this statement. Their brother did not tell them that he thought he had killed Jeanne; he told them in fact that he killed Jeanne, he said he was on his way to the bridge to jump and he told one of them the essential details of the killing. The defendant not only recalled the calls, therefore, but he tried, unsuccessfully through his trial testimony, to change the content of those calls after the fact.
In addition, although the defendant testified on direct examination at trial that he had no memory of stopping on the bridge, getting onto the eye-beam or speaking with Detective Rosa, that lack of memory is contradicted by his own testimony on cross-examination and by his prior statements. On cross-examination he admitted that he recalled stopping on the bridge, putting on his flashers, getting out, and speaking to Detective Rosa on the eye-beam. He told Drs. Wall and Brennan in the competency evaluation that he got out of his car at the top of the bridge and went out on a girder. He said that Detective Rosa lured him off the bridge. The defendant told Dr. Ingall that he recalled telling Detective Rosa that he thought he had killed Jeanne and that he had run over her head twice. From these statements, it is clear not only that the defendant went out onto a girder on the bridge, but that he recalled doing so and recalled his admissions to Detective Rosa about the crime.
While the defendant testified also that he had no recollection of speaking to Nurse Aubin and Dr. Gleason or any memory of being in Newport Hospital, his testimony is contradicted by their testimony. It is the job of nurses and doctors to be able to tell when a person is oriented and understands their questions. Notwithstanding some evidence of intoxication, they said he clearly knew where he was, responded to their questions and had no trouble understanding them.
The defendant, in essence, wants this Court to believe that his lack of thoughts occurred only when he was hurting Jeanne but not in between his series of assaults when he was planning his next step. He wants this Court to believe that his first lapse in memory occurred, coincidentally, at the very moment that he began to act to end Jeanne's life once and for all. He then wants this Court to believe that, once Jeanne was dead, his memory resumed long enough for him to realize that something bad had happened to her, to provide some explanation as to why, at that very moment, he would be heading to the Newport Bridge to kill himself. The defendant then wants this Court to believe that his memory thereafter faded in and out such that he recalled only innocuous events (i.e., a sign to the bridge, the paying of tolls, a vision of his friend Rosa, an IV in his arm and the prison walls) but not his damning admissions or confessions to his sisters, the police or hospital personnel.
This Court cannot accept the defendant's memory of convenience. The defendant's testimony in this regard is incredible and entirely at odds with his own prior statements.
Perhaps cognizant of the damning admissions the defendant makes about the crime after the fact and the inconsistencies in his statements as to thoughts during the crime and memory, neither of the defense experts use and post-crime evidence to support their opinions that the defendant lacked specific intent. Their analyses in this regard stand in stark contrast to that of Dr. Wall who focused appropriately on the evidence of the defendant's state of mind both before and after the crime. In this way, the defense experts, and the defendant by extension, try to focus the Court on the defendant's statements and other evidence of his klonopin ingestion before the crime and the nature of the crime itself to negate specific intent.
There is no question that the defendant, after the crime, showed signs of intoxication. If the Slater Hospital toxicology test is accepted as accurate and the Newport Hospital test is accepted as inaccurate, as all experts agree, the defendant could have ingested enough klonopin before the crime to make him intoxicated to some degree at the time of the crime and thereafter; alternatively, he could have ingested the klonopin just prior to the crime or shortly thereafter and manifested intoxication after the crime. From a pharmacological standpoint, that ingestion could have occurred before or after the crime.
The defendant wants this Court to believe that he ingested large amounts of klonopin throughout the day of the wedding. Yet all of his statements in the immediate aftermath of the crime indicate the ingestion of klonopin after the crime. He told his sister Cindy on the way to the bridge that he had swallowed a bottle of pills. She said she heard him swallowing. He told Detective Rosa that he had taken 25-30 pills. He told him that because he felt them beginning to work. He suggested to Trooper Liu that he had taken his normal prescription of 3-4 klonopin during the day. At Newport Hospital he told Dr. Gleason that he took the rest of a bottle or the remainder of a bottle of klonopin of about 35 tablets on the bridge. While he told Nurse Aubin that he took 20 buspar pills on the bridge, he never mentioned klonopin to her. Nonetheless, he was clear that whatever pills he took were taken after he hurt Jeanne and because he was scared. Upon his commitment to the ACI. the defendant told a nurse that he had ingested a full bottle of klonopin, which she characterized in her notes as a suicide attempt. At no time did he tell any of these people that he had taken a large amount of klonopin before the crime; in fact he indicated that he took a normal dose of klonopin during the day. Recognizing the truth in these statements, the defendant again feigns any memory of any statements to his sister, the police or hospital personnel.
The first time the defendant begins to weave his tale of klonopin ingestion before the crime and during the day of the wedding is during his competency evaluation with Dr. Wall, after he has retained counsel. At this time, he had it in his mind that he needed to prove that he was intoxicated on klonopin at the time of the crime. He said that he took 3-4 klonopin every hour or so until the bottle was gone and then drove home erratically.
By the time he talked to Dr. Ingall, he had changed his story. He expanded his story of klonopin ingestion during the day of the wedding but then said that he did not finish the bottle of klonopin at the wedding but indeed took klonopin on the way to the bridge and on the bridge, as his original statements after the crime indicated. Perhaps his story to Dr. Ingall was a way to keep his own story of before the crime ingestion intact while reconciling that story in some fashion with statements that he knew he had made to his sister, the police and the Newport Hospital personnel.
By the time of trial, the defendant had worked hard to define the exact times and places he took the klonopin during the day of the wedding. He reverted to his story in the competency evaluation where he said that he finished all of the klonopin before the crime. This time he said he medicated himself with the rest of the klonopin was when he went in the car to put the ring away. He then tried, in vain, to say that it was buspar he took on the way to the bridge.
Taking all of these statements together, it is clear to me that he admits to taking klonopin either just before or soon after the crime. His story in that regard is consistent with his earlier statements to his sister, the police and hospital personnel. He then marries that essential truth with a fictional story of heavy use during the wedding day where he just makes up times and amounts as he goes along.
Recognizing the inherent unreliability in the defendant's statements of klonopin ingestion, Dr. Ingall suggests that there is evidence, apart from the defendant's own statements, that he was intoxicated before the crime. He first references an alleged angry exchange between Brad and a cousin at the wedding who thought Brad was intoxicated. There is no evidence of such an exchange in Dr. Ingall's report. There likewise was no evidence of such an exchange in the evidence adduced at trial either through the testimony of the defendant or through any such alleged cousin. There is absolutely no evidence, therefore, that such an exchange took place. Dr. Ingall admitted as much on cross-examination.
Dr. Ingall next references an alleged incident where a brother-in-law asks Brad if he were intoxicated. This reference is apparently to the interchange not between Brad and his brother-in-law but between Brad and Jeanne's brother, Albert Girard, Jr., as they were leaving the reception. While Dr. Ingall characterizes it as a discussion in which Mr. Girard asked the defendant if he (Brad) were intoxicated, that does not square with the credible testimony of Mr. Girard as to the interchange. Mr. Girard described a heart-to-heart conversation with Brad at the end of the reception about how things were going between Brad and Jeanne and how Brad felt being at the wedding with Jeanne's ex-husband, Wayne. Brad was very upset as he talked about how he did not want to meet Jeanne's ex-husband's family. He mentioned at one point that he was taking tranquilizers, at which point Albert said if you are on tranquilizers, I hope you aren't drinking. Brad assured him that he had not been drinking and said at most he was looped on Sprite. Albert did not see Brad slur his speech, stagger or otherwise show any visible signs of intoxication. Based on his credible testimony at trial, Albert did not think Brad was intoxicated. While the defendant tried to suggest in his testimony that the only reason Albert asked him if he had been drinking was because "he must have figured that I was staggering or something", his testimony was not credible in that regard. The defendant acknowledged the conversation with Albert but failed to convince the Court that he was intoxicated at the time or that Albert thought he was intoxicated. There is no evidentiary support, therefore, for Dr. Ingall's reference to this exchange as buttressing his opinion that the defendant was intoxicated from klonopin at this time.
In further support of his opinion that the defendant was intoxicated before the crime, Dr. Ingall makes reference to Jeanne telling Brad he was taking too many pills. That statement is an exaggeration of the evidence in this regard. On the way to the wedding, according to Josee Davis, Jeanne chastised Brad for taking a second pill (of unknown type), saying that he had just taken one an hour or an hour and a half ago and would be flat on his face. Brad said he could handle it. There is no evidence that this pill or the prior one was klonopin. Although both Dr. Ingall and Dr. Swift assumed that it was klonopin, there is no evidence, apart from the defendant's own statement, to suggest it was klonopin or to suggest that Brad took more than two pills of whatever kind. Brad admitted to this exchange in his trial testimony, but tried to make it look like more than two pills. He said that he and Jeanne had a similar exchange in the house a half hour before. His testimony was a transparent attempt to make Jeanne's comments occur on more than one occasion, one time of which Josee Davis was not a witness. Jeanne's statement in the car, therefore, is not evidence of Brad's intoxication on klonopin before the killing.
Next, Dr. Ingall makes reference to Brad's difficulty in driving home from the wedding to support his opinion that Brad showed signs of intoxication prior to the crime. Interestingly enough, while Dr. Ingall's reference to Brad's impaired driving on the way home from the wedding appears in all of Dr. Ingall's reports (based on statements the defendant made in the competency evaluation and in his interview with Dr. Ingall in October, 1999), Dr. Ingall does not specifically list this alleged fact in the laundry list of factors in his final report that support his conclusions as to klonopin intoxication and its effect on the defendant's mental state. He generated his final report on January 17, 2001, after Josee Davis' compelling in-court testimony about a problem-free ride home. It is clear from Josee Davis' testimony that Brad's driving was not impaired on the way home from the wedding and that he and Jeanne had no argument about anything, including his driving. Given Josee Davis' nervousness about driving and refusal to drive on freeways, she certainly would have noticed had anything concerned her about Brad's ability to drive. In addition, Josee Davis testified credibly that Brad was fine on the way home and after they got there. The only problem he evidenced was with Jeanne's insistence that he meet her ex-husband's family.
Josee Davis' testimony about the drive home stood in vivid contrast to that of the defendant. He mentioned in the competency evaluation that he drove erratically on the way home from the wedding, that Jeanne was screaming at him and that he was really out of it. He told Dr. Ingall that he and Jeanne argued in the car, that he was driving erratically, that he heard branches brushing against the side of his car and he felt as if he were in a fog. At trial, now having heard Josee Davis' in-court testimony, all the defendant said was that his car was in the high speed lane riding close to the berm and that Jeanne hollered for him to pull back to the right and to get off the berm. He was not credible. As such, the evidence does not support Dr. Ingall's factual assumption that Brad had trouble driving on the way home from the wedding.
Finally, as corroboration for defendant's statements about klonopin intoxication before the crime, both Dr. Ingall and Dr. Swift place great emphasis on the crime itself. They claim it mirrors other violent and disinhibited conduct in which the defendant has engaged in the past while intoxicated (such as the bridge incident with his first wife). While it is true that the defendant has shown violence when intoxicated, he also has shown many instances of anger without drinking. Indeed, as evidenced by his response when confronted with the tape of his phone calls in March 1997, the defendant is all too quick to blame his "anger and violence on drinking, even when that is not the case. Dr Fixman was wrestling with whether he even had an alcohol abuse problem, after noting instances of alleged alcohol related misconduct. In the one counselling session the defendant attended jointly with Jeanne, Dr. Lyon noted that Jeanne had encouraged Brad to seek therapy for anger management. The defendant denied any alcohol abuse and none was diagnosed. Even in his relationship with his first wife, he was prone to violence when not drinking. It is dangerous and inappropriate, therefore, to use the nature of the crime itself to prove intoxication.
Against this backdrop of Brad's tale of klonopin intoxication during the wedding is the absence of any evidence of intoxication until he is on the bridge. The wedding video stands in sharp contrast to the booking video. When his intoxication does emerge, it emerges in the way most people expect klonopin to act. In contrast, according to the literature, people who show behavioral disinhibition from klonopin usually continue to show it until the medication is out of their bloodstream.
Brad was not a man who liked to take medication. Indeed, he was non-compliant with his medications and went to doctors primarily at Jeanne's insistence. He played games with his doctors, constantly creating reasons for them to take him off certain medications. His story of medicating himself on the day of the wedding, when viewed in that light, simply does not make any sense. He had a problem with anger that he did not solve with medication. That is why he is all over the lot about how much klonopin he took at what times and how much he had available to him on the day of the crime. It is far more credible that any klonopin he took that day was to medicate himself immediately before he confronted Jeanne or as a suicide gesture.
Simply put, I do not believe the defendant's woven tale of klonopin ingestion. I believe that any klonopin he took that day was taken immediately before or just after the crime. I do not assign any weight to any of the other corroborative evidence marshaled in his favor. I do not accept his testimony that he lacked thoughts during the crime and memories thereafter. Absent such credible evidence, his defense of diminished capacity is built on sand. Through the sheer incredulity of his testimony, he has eliminated voluntary klonopin intoxication as a defense to murder. On the state of this evidence, no rationale finder of fact could find that the defendant had a capacity so diminished by klonopin as to preclude him from premeditating or forming an intent to kill. Rooting his diminished capacity defense in an overdose of klonopin may indeed be the ultimate irony: using a type of medication that was part of Jeanne's attempt to help him with anger to justify his anger toward her that led to her death.
Moreover, even assuming that some evidence exists of klonopin intoxication in the defendant before the crime, it is not possible, given this Court's rejection of the defendant's testimony as to the absence of thoughts and memories, that his level of intoxication met the Vanasse standard. It is my judgment, beyond a reasonable doubt, based on the persuasive opinion testimony of Dr. Wall, that the defendant's level of klonopin intoxication (if any), together with his psychiatric conditions (anxiety disorder/personality disorder) did not paralyze his will, take from him the power to withstand evil impulses or render his mind incapable of forming a sane design. He had no black-outs or loss of memory. He planned his actions with the ring, the sequence of assaults and the bridge. He knew what he did was wrong, .as evidenced by his statements to his sisters, the police and Newport Hospital personnel. He knew what he was doing at the time: assaulting "Jeanne in increasing stages of severity until she died, simply because she would not shut up. Klonopin did not render him incapable of premeditating and forming an intent; he had those capabilities and he exercised them.
 The Charge of First Degree Murder: Revisited
After considering all of the evidence in this case, this Court remains convinced, beyond a reasonable doubt, that the defendant murdered Jeanne Robinson willfully, maliciously and with premeditation and deliberation. Those reasons indicated for that decision in response to the defendant's motion to dismiss, are hereby incorporated by reference. Although the Court reached that decision without consideration of any of the evidence in the defendant's case, the testimony of the defendant now compels his conviction for first degree murder even more strongly.
When the defendant testified at trial as to the crime, he tried to separate the choking episode from the beating episode from the episode of running her over with his car. He let Jeanne catch her breath, he let her get a drink of water and he let her run for help. In reality, there were not three isolated episodes. He embarked on a continuous, sustained attack with the intent to kill. As the defendant described his crimes, he was intensely unemotional and matter-of-fact. I was most struck, however, by the passage of time. As he described the crimes from start to finish, the moments passed like hours. He clearly had the ability to stop, and chose not to. He had the ability to reflect, and had done so. He formed the intent to kill, for more than a moment, but will not yet admit it.
 A Crime of Torture and Aggravated Battery
Rhode Island General Laws § 11-23-2 provides in pertinent part that every person guilty of first-degree murder committed in a manner involving torture or an aggravated battery to the victim shall be imprisoned for life, and if ordered by the court pursuant to chapter 19.2 of title 12, such person shall not be eligible for parole from imprisonment.
Although our Supreme court has not definitively defined the terms "torture" or "aggravated battery," it has acknowledged definitions used by our trial courts and the United States Supreme Court. In State v.Lassor, 555 A.2d 339 (R.I. 1989), the court recognized that the United States Supreme Court's definitions of "aggravated battery" and "torture" as "constituting the malicious causing of bodily harm to another by depriving him [or her] of a member of his [or her] body or by rendering a member of his [or her] body useless or by seriously disfiguring his [or her] body or a member thereof' or requiring "evidence of serious physical abuse of the victim before death." 555 A.2d at 354 (citing Godfrey v.Georgia, 446 U.S. 420, 431-32 n.13, 100 S.Ct. 1759, 1766 n. 13, 64 L.Ed.2d 398, 408 n.13 (1980)). Subsequently, in State v. Wilson,568 A.2d 764 (R.I. 1990), the Court upheld our trial court's defining "battery" as "the physical result of the accomplished assault that is to say, a consummation of the assault" and "aggravated" as "making an existing situation worse or more serious or more severe." 568 A.2d at 769. As in Lassor, the Wilson Court recognized the Godfrey definition of "aggravated battery"; however, it did not decide if that definition is binding on courts in this state. Id. Moreover, our Supreme Court has stated that the terms "torture" and "aggravated battery" do not need to be specifically defined for a jury because the ordinary meanings of the terms are within the understanding of a jury. State v. Travis.568 A.2d 316, 323-24 (R.I. 1990). Nevertheless, it indicated that the terms' ordinary meanings include situations in which a defendant "inflict[s] pain and traumatic force beyond that which would ordinarily be expected even in the case of homicide." Id.
The procedure for sentencing a defendant to life imprisonment without parole is statutorily prescribed. G.L. 1956 § 12-19.2-1. et seq. In all cases in which the penalty of life imprisonment without parole may be imposed pursuant to G.L. 1956 §§ 11-23-2 or 11-23-2.1, the Attorney General must recommend to the court in writing within twenty (20) days of the date of the arraignment that such a sentence be imposed. §§ 12-19.2 1, 2, 3; see also Travis, 568 A.2d at 322, Lassor, 555 A.2d at 352. Thereafter, in all cases tried by a judge sitting without a jury, the court shall, if it finds the defendant guilty of first-degree murder, render a finding as to whether the state has proven beyond a reasonable doubt that the murder committed by the defendant involved the enumerated circumstance, herein torture or an aggravated battery [§11-23-2(b)(4)], as the basis for imposition of a sentence of life imprisonment without parole. § 12-19.2-2(a); State v. Smith,602 A.2d 931 (R.I. 1992) (the state has the burden of proof regarding torture or aggravated battery for sentence of imprisonment of life without parole). Upon finding that torture or an aggravated battery is present, the trial court then must state on the record that torture or aggravated battery exist beyond a reasonable doubt. Id. Upon such a finding, the trial court must hold a presentence evidentiary hearing and then, after considering evidence regarding aggravating and/or mitigating circumstances, sentence the defendant to life imprisonment without parole or life imprisonment. §§ 12-19.2-2 (b), 4. The trial court must state on the record its reasons for imposing its sentence. § 12-19.2-4. A defendant may appeal the sentence of life imprisonment without parole. § 12- 19.2-5. Upon review, the Supreme Court will exercise its discretion in determining whether or not the sentence is appropriate. § 12-19.2-5.; State v. Tassone, 749 A.2d 1112, 1119 (R.I. 2000) (citing Travis, 568 A.2d 316 (R.I. 1990); Lassor, 555 A.2d 339 (R.I. 1989)).
The defendant's first-degree murder of Jeanne Robinson unquestionably was a crime of aggravated battery. He seriously abused her physically and disfigured her body before her death by strangling her almost to the point of death, beating her over the head with a flashlight repeatedly, silencing her and then running her over with his car before her compressed body was dragged by the car down the driveway and out into the street. With each successive act, he made the prior assault and battery of her more aggravated and severe.
The defendant's act of murdering Jeanne Robinson also was a crime of torture. The defendant choked Jeanne, beat her and ran her over to punish her for not shutting up and for leaving him. When he failed to coerce her to submit to his will, he resorted to increasingly punitive measures. The sum total of his punitive acts inflicted trauma and pain to her mind and body beyond that which ordinarily would be expected, even in the case of homicide. To reach that conclusion, one need only look at this crime through the eyes of the victim. She endured the choking only to be beaten in the head with a mammoth flashlight. She endured the bloody beatings and managed to cry for help outside, only to be silenced and placed under the wheels of an automobile. Jeanne undoubtedly knew, as she lay. behind her locked bedroom door, that this could be the end. She undoubtedly knew after the beatings and as her plea for help went unanswered, that this would be the end.
This Court finds, therefore, beyond a reasonable doubt, that the defendant's crime of murder in the first degree was a crime of torture and aggravated battery. As such, this case must proceed to a presentence evidentiary hearing, after which the Court will decide whether to impose a sentence of life in prison without parole, as timely recommended by the State in accordance with statute, or a sentence of life imprisonment.
 CONCLUSION
Following the non-jury trial of this matter, this Court finds the defendant, Edwin B. Edwards, guilty, beyond a reasonable doubt, of the crime of domestic murder in the first degree of his former fiancee, Jeanne Robinson, on September 18-19, 1999 in Cranston, Rhode, Island. This Court rejects the defendant's defense of diminished capacity due to voluntary intoxication from klonopin and finds, beyond a reasonable doubt, that the defendant had the capacity to and in fact did commit this murder with malice aforethought and deliberation and premeditation of more than a momentary duration. The Court finds further, beyond a reasonable doubt, that this first-degree murder was a crime of torture and aggravated battery, necessitating an evidentiary hearing with respect to the State's recommendation that the defendant be sentenced to life in prison without the possibility of parole.
[1] However, premeditation and deliberation are not necessary elements of murder in the second degree. Grabowski, 644 A.2d at 1285 (citingMattatall, 603 A.2d at 1106); see also Parkhurst, 706 A.2d at 421 (citingIovino, 554 A.2d at 1039) ("[P]premeditation and intent to kill are not the exclusive grounds for a finding of the malice necessary to sustain a conviction of second-degree murder."). "To prove murder in the second degree, the State must prove beyond a reasonable doubt only that the defendant unlawfully killed the decedent with malice." Mattatall, 603 A.2d at 1106. The malice element of second-degree murder may be established by three means:
 "(1) showing a premeditated intent to kill in the mind of the accused for a very brief time before the killing, (2) proving the defendant's conscious disregard for the possibility of death or great bodily harm, or (3) establishing that the defendant committed a homicide in the perpetration of an inherently dangerous felony not enumerated as a first-degree murder felony." Parkhurst, 706 A.2d at 421 (citing Iovino, 554 A.2d at 1039 and G.L. 1956 § 11- 23-1). "If there is a formation of the intent to kill, however brief, it can satisfy the necessary element to establish malicious intent. Mattatall, 603 A.2d at 1106. "Malice may be inferred from the attending circumstances surrounding a defendant's conduct." McGranahan, 415 A.2d at 1302 (citation omitted). However, "[I]intent to kill is not a required element of second-degree murder when the state moves to convict a defendant on a theory of wanton recklessness or felony murder." Parkhurst
706 A.2d at 421. Evidence demonstrating "a recklessness of consequence or an extreme indifference to the sanctity of human life" is sufficient to sustain a conviction for second-degree murder. Mattatall, 603 A.2d at 1106; McGranahan, 415 A.2d at 1302.